**UNITED STATES of America**

v.

**Clarence JOHNSON, Appellant.**

**No. 23168.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1970.

Decided June 19, 1970.

Petition for Rehearing Denied Aug. 12, 1970.
Certiorari Denied Dec. 7, 1970.
See 91 S.Ct. 257.

Mr. John C. Reid, Washington, D.C., (appointed by this court) for appellant.

Mr. Robert C. Crimmins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Richard A. Hibey, Asst. U. S. Attys., were on the brief, for appellee.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

After a jury trial in the District Court, appellant was convicted of five counts of armed robbery, six counts of assault with a dangerous weapon, and one count of carrying a dangerous weapon. D.C.Code §§ 22–2901, 22–502, 22–3204. Concurrent prison sentences were imposed in respect of each count. In this court appellant complains that (1) the evidence was insufficient to sustain his conviction on the robbery and assault charges and (2) the so-called *Allen* charge given by the trial judge was unduly coercive under the circumstances. We affirm.

I

At approximately 1 P.M. on the date of the robbery, two police officers observed appellant's white 1960 Corvair sedan, driven by appellant and occupied by five companions, cruising slowly in the lot of a Safeway store at 17th and I Streets, Northeast. One of the officers testified that appellant was driving the car and the occupants appeared to be "casing" the store. When they sighted the police car, they took off at a high rate of speed and were lost in traffic. The officers noted the D.C. tag number, which was traced to appellant.

Not long thereafter, at approximately 2:55 P.M., a Safeway store at 6501 Georgia Avenue, Northwest, was robbed by five armed men. After the robbery, the men fled the store, crossed the street and entered what the pursuing victims testified to be a white 1960 or 1961 Corvair sedan which began to move before all the doors were closed, indicating that a driver was behind the wheel while the holdup took place. Employees of the store testified to the taking of money from the store cash registers totalling $2,226.22.

The incident was immediately reported to the authorities, and the relevant facts broadcast over the police radio. Hearing the broadcast, the officers who had first observed appellant's auto at 1 P.M. proceeded to the vicinity of appellant's home, knowledge of the location of which they had gotten from the license tag check. Shortly thereafter, appellant drove up and the officers approached the car. Seeing a pistol on the floorboard

of the car, appellant was taken into custody, and $292.00 in bills, $3.00 in quarters, and revolver ammunition were found in appellant's pocket. The pistol, for which appellant did not have a license, was also seized.

The Government's case at trial consisted of descriptions of the event by the various victims, the testimony of two employees who observed the robbers as they left the store and entered the vehicle, and the testimony of the police officer about the earlier observation and the subsequent arrest. None of the Safeway employee witnesses could identify appellant.

At the close of the Government's case, appellant moved for a judgment of acquittal which was denied. Appellant presented no evidence.

In light of the extensive indictment, the charge of the trial court was long and complex. Near the close of its original charge, the court stated:

> You should examine the questions submitted with candor and with proper regard and deference to the opinions of each other. You should listen to each other's arguments with a disposition to be convinced.

> If much the larger number of jurors are for conviction, a dissenting juror should consider carefully whether his doubt is a reasonable one when it makes no impression upon the minds of so many jurors, equally honest, equally intelligent with him or herself.

> If on the other hand, the majority are for acquittal, the minority ought to ask themselves and carefully consider whether they might not reasonably doubt the correctness of their judgment which is not concurred in by the majority.

The jury deliberated from 3:35 to 5:00 P.M., and were excused for the night without having reached a verdict. Shortly after resuming the next morning, it reported a deadlock; and at 10:10 A.M. the following charge was given:

> Ladies and gentlemen of the jury, the mode for deciding questions of fact in criminal cases is by verdict of a jury.

> In a large proportion of cases, absolute certainty cannot be attained or expected.

> Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and no mere acquiescence in the conclusion of his fellow jurors, yet in order to bring the minds of twelve jurors to a unanimous verdict, each juror must examine the questions submitted with candor and with proper regard and deference to the opinions of each other.

> With this in view, it is your duty to decide the case if you can conscientiously do so.

> In this case, the burden of proof is on the government to prove beyond a reasonable doubt every element of the offenses charged.

> If the government fails to sustain this burden, you must find the defendant not guilty, but in conferring together you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments.

> On the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one which makes no impression upon the minds of so many jurors, equally honest, equally intelligent with himself, who have heard the same evidence with the same attention and who equally desire to arrive at the truth under the sanction of the same oath.

> On the other hand, if the majority are for acquittal, the minority ought to ask themselves seriously whether they might not reasonably doubt the correctness of the judgment which is not concurred in by most of those with whom they are associated.

In like manner, the minority should question the weight or sufficiency of that evidence which fails to sway the minds of their fellow jurors.

I want you to go back to the jury room and consider the case in the light of these additional observations that I have given you.

The jury retired to the jury room at 10:25 and returned at 2:20 P.M. with a verdict of guilty on all counts. This appeal from the robbery and assault convictions followed. No appeal was taken from the conviction for carrying a dangerous weapon.

## II

Appellant's claim of error in the denial of his motion for acquittal rests heavily upon the fact that the two Safeway employee witnesses, who actually saw the bandits depart in the white Corvair, could not identify appellant as either one of the armed robbers who came into the store or as the driver of the car in which the get-away was accomplished.[1] It is also insisted that there was no specific testimony establishing that there was a driver waiting in the car for the return of the five described as having come into the store. Lastly, appellant asserts that white Corvair cars are not uncommon and, therefore, the observation of appellant and his companions earlier in the afternoon adds nothing to the proof.

We are not persuaded by this approach. It may be that there was a time when police officers did not observe so closely cars and their occupants in the vicinity of a Safeway store, but it is this kind of alertness which provides the police today with some slight chance of coping with the hit-and-run crime made possible by the combination of disoriented youths, easy access to guns, and the seemingly unrestricted availability of credit to buy automobiles, so prevalent in the contemporary urban scene.

That alertness supplied the license number of an automobile which, in turn, provided the key to detection. While Corvairs, and even white Corvairs, are not novel, when

(1) the circle is narrowed to a 7–8 year old white Corvair sedan occupied by five or six men,

(2) appellant is not only the undisputed owner of a car of that description but is also firmly identified as the driver of one such car seen "casing" another Safeway only two hours before the robbery of the Safeway charged in the indictment (and heading off at high speed when a police car is spotted),

(3) there is evidence rationally indicating that there was a driver waiting in the car outside the Safeway that was robbed,[2] and

(4) shortly after the robbery, appellant drives the car home, armed and in possession of some hundreds of dollars in cash, an amount within a reasonable range of an aliquot share of the sum taken from the Safeway,[3]

we think the case presents a combination of elements which a reasonable jury could conclude comports with the essence of the reasonable doubt standard.

---

1. The Assistant Manager of the store that was robbed testified that he pursued the five fleeing bandits. He saw them run to a white Corvair which began to move before the doors were shut. He and another employee in their own car followed the white Corvair for a time but broke off the pursuit when it appeared likely that they might be shot at. The witness later in the day viewed appellant's car at the police station and said that it looked like the one used by the robbers.

2. As noted above, the witness who saw the robbers flee to the white Corvair testified that the car began to move before all the doors were closed.

3. The evidence showed at least five, and very likely six, participants in the robbery. The amount on appellant's person was approximately one seventh of the $2226 stolen.

The flow of events emerging from the testimony does not, of course, fix appellant's guilt beyond peradventure, but it creates that aura of probability which warrants committing the matter to the good sense of the jurors, instructed as to the legal standard of reasonable doubt and informed by their instinct for recognizing that point beyond which the odds of a miscarriage of justice become too great for the individual conscience to bear. There is no automatic and invariable measure by which the requisite *quantum* of evidence can be determined. The shadings of fact are infinite. *Compare* Bailey v. United States, 128 U.S. App.D.C. 354, 389 F.2d 305 (1967), *with* Goodwin v. United States, 121 U.S.App. D.C. 9, 347 F.2d 793 (1965). The legal formulae are, of course, readily at hand, but their incantation still leaves subjective judgments to be made. We cannot say here that the spectre of injustice was so perilously present as to make the judge's choice to abide by the jury's decision an unacceptable one.

*See* Crawford v. United States, 126 U.S. App.D.C. 156, 375 F.2d 332 (1967).

### III

Appellant's second assignment of error concerns the use of the *Allen* charge.[4] Thus there is raised again in this circuit the widening challenge to which this method of instructing juries has been subjected.[5] The argument derives from a rationale similar to that employed by the Supreme Court in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), namely, that the jury must be protected from all potentially coercive influences. A further consideration is said to be the defendant's purported "right" to a mistrial when the jury's deliberations are prolonged. The rule of unanimity is imposed to guarantee as much certainty as is humanly possible. If such certainty does not exist, it is unfair, so the argument goes, to induce it artificially.

Contrarily, considerations of efficient judicial administration argue eloquently

4. The name derives from the case of Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the Supreme Court refused to reverse because the jury had, after beginning its deliberations, been summoned to return for further instructions. *See also* Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952). The instructions so given were characterized by the Court in *Allen* as follows (164 U.S. at p. 501, 17 S.Ct. at p. 157):
"* * * These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally

honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. These instructions were taken literally from a charge in a criminal case which was approved of by the Supreme Court of Massachusetts in Com. v. Tuey, 8 Cush. 1, and by the Supreme Court of Connecticut in State v. Smith, 49 Connecticut, 376, 386."

5. *See, e. g.,* United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969) (modifying the *Allen* charge in that circuit); Andrews v. United States, 309 F.2d 127 (5th Cir. 1962) (Wisdom, J., dissenting); Huffman v. United States, 297 F.2d 754, 759 (5th Cir. 1962) (Brown, J., dissenting); Jenkins v. United States, 117 U.S. App.D.C. 346, 347, 330 F.2d 220, 221 (1964) (Wright, J., dissenting); Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100 (1968); Note, Due Process, Judicial Economy and the Hung Jury: A Re-Examination of the Allen Charge, 53 Va.L.Rev. 123 (1967); Note, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U.Chi. L.Rev. 386 (1964).

for affording the trial judge some opportunity to ferret out the petty disagreements and personality clashes which jeopardize the jury's functioning, while leaving undisturbed substantial disputes over the evidence in the case. The problems presented by these conflicting approaches have recently been subjected to expert exploration and the exercise of experienced and informed judgment by the American Bar Association Project on Minimum Standards for Criminal Justice. Its distinguished Advisory Committee on the Criminal Trial, chaired by Justice Walter V. Schaefer of the Illinois Supreme Court, analyzed the competing considerations at length (Standards Relating to Trial by Jury, pp. 145–158) and concluded to recommend the following standard, which subsequently received the approval of the House of Delegates:

§ 5.4 Length of Deliberations; deadlocked jury

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

This approach, recently adopted by the Seventh Circuit in United States v. Brown, 411 F.2d 930 (1969),[6] impresses the jurors at the outset with the gravity of their responsibilities. Given after an apparent deadlock, it may free a jury mired in irrelevant disagreement usefully to return to the business of evaluating the evidence. Yet it is relatively free of potentially coercive references, does not tend to place proponents of a minority view in a vulnerable position, and does not perpetuate the unfortunate

---

6. The court in this case rejected constitutional claims that the use of the *Allen* charge in any form conflicts with the Sixth Amendment right to jury trial and the due process of law guaranteed by the Fifth. It was impressed, however, with the difficulties arising out of varying forms of the charge and some of the elements usually contained in it. It concluded that "it would serve the interests of justice to require under our supervisory power that, in the future, district courts within this Circuit when faced with deadlocked juries comply with the standards suggested by the American Bar Association's Trial By Jury publication." It affirmed the conviction in the case before it, but required the observance for the future, in both civil and criminal cases, of the recommended standards.

fiction that, in case of a mistrial, another jury will inevitably be assembled to consider the case.[7]

A prime consideration motivating the promulgation of the ABA Standard is the large amount of litigation which the use of the original *Allen* charge has engendered. We, on occasion, have seen criminal appeals in which it is the only issue raised, and we can, therefore, fully understand why a decade ago the Arizona Supreme Court ruled it out because its "evils far out-weigh the benefits." State v. Thomas, 86 Ariz. 161, 166, 342 P.2d 197, 200 (1959).[8] One of the sources of trouble on appeal has been that the language actually used tends to vary from judge to judge, and this lack of uniformity in a delicate context is full of pitfalls.[9] With this circumstance in mind, we think it significant that the ABA Project was at pains to set out in its Commentary (pp. 146–147) to Section 5.4(a) of the Standard the text of an instruction which it regarded as consistent with Section 5.4(a). This is Instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97–98 (1969), which is as follows:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

We note the essential identity of this charge with what is said on the subject in the Handbook for Jurors serving in the United States District Court, which has been prepared and distributed under the authorization of the Judicial Conference of the United States. A distinguished member of the District Court of this Circuit, the late Alexander Holtzoff, was a member of the committee that prepared this handbook. Its admonitions to the jurors on this subject are as follows:

> Jurors must enter the discussion with open minds. They should freely exchange views. They should not hesitate to change their opinions if they are shown to be wrong.
>
> In a criminal case all jurors must agree on the verdict. This is also required in a civil case, unless the jury is otherwise instructed by the court.
>
> The jurors have a duty to give full consideration to the opinion of their fellow jurors. They should try to reach a verdict whenever possible. However, no juror is required to give up any opinion which he is convinced is correct.

7. The question of whether a mistrial will or will not be followed by a renewed prosecution is so speculative that nothing should be said on the matter either way.

8. Similar outlawing at the state level through judicial supervisory power has occurred in Montana. State v. Randall, 137 Mont. 534, 353 P.2d 1054 (1960).

9. In the latest rejection by this court of a thorough-going challenge to the *Allen* charge, Judge (now Chief Justice) Burger concluded his opinion by noting that "considerable work for this court would be eliminated if District Judges would consistently use a form of instruction plainly within *Allen*." Fulwood v. United States, 125 U.S.App.D.C. 183, 186, 369 F.2d 960, 963 (1966). Judge Burger served as Chairman of the ABA Special Committee on Minimum Standards in 1968–69.

The ABA Project has not, in any meaningful sense, recommended abandonment of the *Allen* charge. Neither has it proscribed its use after deadlock. It has recommended the elimination from the charge of the references to a deference owed by a minority to a majority. If Section 5.4(a) of the ABA recommendation, relating to the content of the charge, be compared closely with the Supreme Court's summary in *Allen* itself, Note 2 *supra*, it will be seen that this is the only element of the *Allen* charge as approved by the Supreme Court that is eliminated.[10] But it is the one which has widely been thought to contain the true dangers to free and unfettered exercise of individual judgment and expression of conscience which is at the very core of the jury system. Many trial judges, although still using the *Allen* charge, have abandoned this element of it long ago. With the benefit of the new American Bar Association analysis and recommendation, trial judges in this circuit may hereafter think it desirable to do the same.

The charge given in the instant case was, however, substantially in accord with the standards heretofore prevalent in the District of Columbia. *See* Instruction No. 41, Junior Bar Association Criminal Jury Instructions for the District of Columbia (1966). That charge, even with some minor changes in phraseology likely to influence a jury to agree on a verdict, was approved in *Fulwood*. The court there found that the charge as given was not coercive, relying *inter alia* on the fact that the judge did not send the jury out to deliberate forthwith but recessed deliberations for the night, and further that the judge expressed merely a "hope" that the jury would agree.

 *Fulwood* would not have foreclosed appellant from claiming that in the circumstances of this case—close as it was on the sufficiency of the evidence, and with the jury sent to deliberate forthwith and without the softening of "hope" language—the charge did have coercive impact. But the defense trial counsel did not object to the charge. This is not merely a technicality. There are situations where defense counsel may believe that it is better to get a verdict from this jury than a mistrial, *e. g.*, the case of a crime so dangerous as to make a *nolle prosse* unlikely; where there is little possibility of the disappearance or weakening of incriminating evidence; or where the current record taken as a whole is as likely to produce a verdict of not guilty as in any future trial. We cannot say that such tactical considerations guided this defense trial counsel, but the possibility is certainly strong enough to lead us to be cautious against any finding of plain error. Fed.R.Crim.P. Rule 52(b).

A separate question to be considered is whether it would not be better to abandon the majority-minority element of the *Allen* charge, and to focus that charge on its major function of counselling the jury to consult open-mindedly with a disposition to hearken to fellow-jurors, and to agree when no violation of conscience is involved. Adoption of such a rule may well be in the interest of the efficient administration of justice, even though charges containing the majority-minority language are not necessarily, or even likely, to be coercive; it would avoid recurring controversies, turning upon subtle questions of coercion in the context of each case. This ground was not considered in *Fulwood*, but it did commend itself to the ABA Project.

In view of the foregoing, a decision adopting such a rule prospectively might well be permissible for a panel, since it does not require overruling *Fulwood* on the grounds identified in that opinion. But in the circumstances before us we think it more responsive to the tradition

10. The ABA has also ruled out something which was never in the *Allen* charge as approved by the Supreme Court, namely, the references to the prospect of a further trial if the jury could not agree.

of this court for this kind of supervisory jurisdiction to be exercised, if at all, only by the court *en banc*. Such consideration *en banc* might also have the benefit of the views of the committee lately authorized by the Judicial Conference of this circuit to examine the standards recommended by the ABA Project and to recommend for implementation by the appropriate courts of this circuit such of those standards as appear likely to improve the administration of criminal justice in this jurisdiction. However, we do not think it appropriate to assert authority as a panel to reconsider *Fulwood*.

The judgment appealed from is, accordingly, affirmed.

It is so ordered.

ROBB, Circuit Judge (concurring in part and dissenting in part):

I agree with the majority that this case should not be reversed because of the trial judge's use of the "Allen charge". However, I do not agree that the evidence was sufficient to sustain appellant's conviction; in my opinion the trial judge should have granted the motion for judgment of acquittal.

I

The case for the prosecution was circumstantial. Taking the circumstances in chronological order we begin with the testimony of a police officer that at about 1:00 o'clock on the afternoon of November 4, 1968, he and another policeman observed an automobile driven by the appellant Johnson "driving very slowly across the driveway * * * in front of the window of the Safeway store" at 17th and I Streets, N.E. There were five other men in the car with Johnson, and all of the men seemed to be looking at "what was going on in the store". The officer volunteered the conclusion that the men "appeared to be casing the Safeway store". He said that "upon seeing us they took off at a high rate of speed" and disappeared in heavy traffic. He testified that the officers took the tag number of the car and "as a result of getting the tag registration" learned the name and address of the appellant. Except for an inference from this testimony there was no evidence that the car was registered in the appellant's name. The officer did not testify as to the make, model or color of the car.

Next we have testimony that at about 3 o'clock on the afternoon of November 4, 1968, the Safeway store at 6501 Georgia Avenue, N.W. was held up and robbed by five men; $2,226.22 was taken. This store is in a different section of the city and some five or six miles from the store at 17th and I Streets, N.E. There was testimony that when the five robbers left the store they escaped in a "white Corvair sedan" the model being "approximately '60, '61". Witnesses testified that the "car took off before they finished getting the doors closed", leading the assistant manager of the store to conclude that there was a driver waiting in the car while the holdup took place. However, no one saw the driver and since the five men could not have entered the car simultaneously one of them might well have got behind the wheel and quickly put the car in motion while the others were closing the doors. No one identified the appellant as one of the five men who robbed the store and left in the getaway car.

Concluding its case, the government proved that having heard a radio complaint of the robbery of the Safeway store at 6501 Georgia Avenue, N.W., the officers who two hours before had seen the appellant and his companions at 17th and I Streets, N.E., went to the vicinity of the appellant's house at 1521 A Street, N.E. This location was some five or six miles from the scene of the holdup. At about half past three the appellant, who was then alone, drove up and was arrested. He had a loaded pistol on the floor of the car and $292.00 in assorted bills, and $3.00 in quarters, in his pocket—substantially less than a one-sixth share of the proceeds of the robbery. The government introduced no evidence to show the amount of money

taken from each individual cash register at the Safeway store; such evidence might have suggested that the $292.00 in bills and $3.00 in quarters had some rational relationship to the specific robbery with which appellant was charged.

The police officer who arrested the appellant and who previously saw him driving the car was not asked to describe the car and did not do so, and the record is silent as to what the tag number was. The only evidence as to the make, model and color of the car was that it was "of the same description" as the car mentioned in the radio complaint. The contents of the radio complaint were not disclosed by the evidence so that we have only a questionable inference that the car was a white Corvair. One of the witnesses to the holdup testified that "later on in the day" of the robbery he went to a police station and saw "a 4-door Corvair sedan" which looked like the same automobile used in the getaway. There was no evidence that the car at the police station was the car that the appellant had been driving or that the appellant was in any way connected with it.

This was the government's entire case. In my judgment this evidence, although it may have generated a suspicion that appellant had participated in the robbery, fell far short of the proof that would justify a jury in finding guilt beyond a reasonable doubt; in other words, it failed to meet the standard under which a trial judge is permitted to allow a criminal case to go to the jury. See Crawford v. United States, 126 U.S. App.D.C. 156, 375 F.2d 332 (1967); Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. den., 331 U.S. 837, 67 S. Ct. 1511, 91 L.Ed. 1850 (1947). In a case such as this, "in which the evidence relied upon to establish guilt is entirely circumstantial, the trial judge may not deny a motion for judgment of acquittal and send the case to the jury unless taking the view most favorable to the Government, there is sufficient evidence to support a verdict of guilty beyond a reasonable doubt". Battles v. United States, 388 F.2d 799, 801–802 (5th Cir. 1968). That standard not having been met, in my opinion, and there being "no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt" the motion for judgment of acquittal should have been granted. Curley v. United States, 81 U.S.App.D.C. 389, 392–393, 160 F.2d 229, 232–233, cert. den., 331 U.S. 837, 67 S.Ct. 1511 (1947). For it is the function of a judgment of acquittal to protect against a decision by the jury based on speculation, surmise, bias or prejudice without evidence adequate in law to support a finding of guilt, Cooper v. United States, 94 U.S.App.D.C. 343, 345, 218 F. 2d 39, 41 (1954); Hunt v. United States, 115 U.S.App.D.C. 1, 316 F.2d 652 (1963); Sleight v. United States, 65 App.D.C. 203, 205, 82 F.2d 459, 461 (1936); and in passing upon a motion for judgment of acquittal, particularly in a case depending upon circumstantial evidence, the trial judge must be careful to differentiate "between pure speculation and legitimate inference from proven facts". Curley v. United States, 81 U.S.App.D.C. 389, 393, 160 F.2d 229, 232 cert. den., 331 U.S. 837, 67 S.Ct. 1511 (1947).

The requirement that guilt must be proved beyond a reasonable doubt is not a dry legal formula or a routine incantation; it is the standard which for centuries has been used, understood and applied by lawyers, judges and jurors, the standard which for centuries has shielded the innocent man from "dubious and unjust convictions" by whimsical juries, "with resulting forfeitures of life, liberty and property." Brinegar v. United States, 338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). It has been "a prime instrument for reducing the risk of convictions resting on factual error," a doctrine designed to give every individual "confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with ut-

most certainty." In re Winship, 397 U. S. 358, 363–364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). See also Egan v. United States, 52 App.D.C. 384, 393, 287 F. 958, 967 (1923); Billeci v. United States, 87 U.S.App.D.C. 274, 283, 184 F. 2d 394, 403 (1950).

The majority reasons that the conviction in this case should be sustained because "the flow of events emerging from the testimony * * * creates that aura of probability which warrants committing the matter to the good sense of the jurors," a probability said to be reinforced by "their instinct for recognizing that point beyond which the odds of a miscarriage of justice become too great for the individual conscience to bear." I cannot agree that a criminal conviction can rest on an "aura of probability" and "instinct". A probability of guilt is not enough; guilt, according to the basic principles of our jurisprudence, must be established beyond a reasonable doubt. Instinctive action imports action without thought and is the very antithesis of the careful consideration and reasoned decision that should be required of jurors.

The majority finds here a "combination of elements which a reasonable jury could conclude comports with the essence of the reasonable doubt standard." One such element which it apparently finds persuasive is the "alertness" of the police in coping with "hit-and-run crime made possible by the combination of disoriented youths, easy access to guns, and the seemingly unrestricted availability of credit to buy automobiles, so prevalent in the contemporary urban scene." I, too, commend the alertness of the police and condemn the shocking rise of crime in our community. But I find these factors irrelevant to the question of whether the government at trial met its burden of introducing evidence sufficient to prove this appellant's guilt beyond a reasonable doubt. See Stevens v. United States, 115 U.S.App.D.C. 332, 334, 319 F.2d 733, 735 (1963). Granting that Washington is crime-ridden, the remedy is not the lowering or abandonment of a time-honored shield in favor of a standard which permits convictions upon proof of a probability of guilt to the satisfaction of the jurors' instincts. The prevalence of crime should not justify jury verdicts by guesswork. The fact that there are disoriented youths, easy access to guns and easy credit is also irrelevant to the issue of this appellant's guilt or innocence. Permitting these considerations to enter a jury's deliberations is to allow it to act "on what would necessarily be only surmise and conjecture, without evidence." Cooper v. United States, 94 U.S.App.D.C. 343, 346, 218 F.2d 39, 42 (1954). By giving weight to such matters the majority in my judgment has condoned an impermissible method of decision-making by a jury and has lowered the traditional safeguard of proof beyond a reasonable doubt.

II

I agree with the majority that there was not plain error in the use of the "Allen charge" by the trial judge; indeed I would find no error even had the matter been properly raised in the District Court. And I fully agree with the majority that any alteration of the standard "Allen charge", approved by this court in Fulwood v. United States, 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. den., 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967) should be promulgated, if at all, only by the court en banc. However, I do not concur in the discussion in which the majority expresses its view about the "Allen charge". Although that discussion is largely unnecessary to the decision I think it appropriate to suggest briefly some points of my disagreement.

The "Allen charge" given by the district judge was in the form approved by the Supreme Court in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L. Ed. 528 (1896). As the Supreme Court noted, the charge was taken literally from a charge approved by the Supreme Court of Massachusetts in Common-

wealth v. Tuey, 8 Cush. 1 (1851). On that court sat Mr. Chief Justice Lemuel Shaw, one of the great judges this country has produced. The charge was again approved by the Supreme Court in Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952), affirming 190 F.2d 506, a capital case. As recently as 1966 it was approved by a panel of this court in Fulwood v. United States, 125 U.S.App.D.C. 183, 369 F. 2d 960 (1966), cert. den., 387 U.S. 934, 87 S.Ct. 2058 (1967). The opinion in that case was written by Circuit Judge Burger, now Chief Justice of the United States. A petition for rehearing *en banc* was denied.

I see no reason to abandon or substantially revise the "Allen charge". As Judge Burger wrote in Fulwood v. United States, 125 U.S.App.D.C. 183, 185, 369 F.2d 960, 962 (1966), cert. den., 387 U.S. 934, 87 S.Ct. 2058 (1967):

> "The *Allen* charge is a carefully balanced method of reminding jurors of their elementary obligations, which they can lose sight of during protracted deliberations. It is perfectly valid to remind them that they should give some thought to the views of others and should reconsider their position in light of those views. The charge as given here did not *require* the jury to reach a verdict but only reminded them of their duty to attempt an accommodation. While it suggests to the minority that they reconsider their position in light of a majority having a different view, it reminds them that they should not acquiesce in a verdict which does not represent their own convictions."

Any group of men and women sitting around a conference table to decide a question of fact, whether in or out of a jury room, could with profit listen to the sensible advice of the "Allen charge". On the other hand the diluted version of the charge proposed by the American Bar Association is in my opinion an invitation to a stubborn or recalcitrant juror to persist in a blind determination that his views shall control, thereby producing a hung jury.