UNITED STATES of America
v.
Samuel M. WASHINGTON, Appellant.
No. 23059.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1970.

Decided Dec. 28, 1970.

Bazelon, Chief Judge, dissented and filed opinion.

Mr. Willard M. Hanger, Washington, D. C. (appointed by this court), for appellant.

Mr. William S. Block, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Nicholas S. Nunzio, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and MacKINNON, Circuit Judge, and CHRISTENSEN,* U. S. District Judge, District of Utah.

MacKINNON, Circuit Judge:

At about 10:45 A.M. at the intersection of 11th and M Streets, N.W., Mrs. Pearl Cunningham, a 67-year-old woman, had her purse snatched by a person she had viewed for several minutes as she approached the intersection on her way to do some shopping at a Safeway store. The victim testified that her purse at the time contained a $5 bill, that light-

* Sitting by designation pursuant to 28 U.S.C. §, 292(c).

ing conditions were good, that she had a "good look" at the person who snatched her pocketbook, that the snatcher was short, wore a green jacket, dark trousers, hush-puppy shoes, was bareheaded and had long hair. Following the snatching, Mrs. Cunningham screamed, the police came in a few minutes and she described her assailant to them. The description was overheard by Officer Lounderman who left immediately in a squad car in search of the suspect. A few minutes thereafter when Lounderman was driving through a nearby alley near 10th and M Streets, N.W., he observed a Negro male with dark brown trousers and a heavy bush haircut running toward the car he was driving. Upon seeing the automobile this man turned at right angles and scaled an adjacent fence. At that time Officer Lounderman noted that the man who was running matched the description given by Mrs. Cunningham in that he had "real heavy hair," brown looking shoes and he thought a green jacket and when the man was scaling the fence he observed he had a lady's black pocketbook in his hand. On the other side of the fence Lounderman arrested Washington, and Lounderman later testified he was the same man he saw running with the lady's pocketbook on the other side of the fence and that a search of Washington's person disclosed a $5 bill. A bystander produced a woman's pocketbook he said he had found in the alley and delivered it to Lounderman. It contained a number of Mrs. Cunningham's personal belongings except a $5 bill she later testified was missing. Immediately after his arrest, Officer Lounderman took Washington back to the scene of the purse snatching where he was identified by Mrs. Cunningham who also testified that the police took a $5 bill out of appellant's pocket at that time.

At the trial Washington attempted to account for the $5 bill by contending it was what was left over from $25 he had borrowed that morning from his employer to make some purchases, but on cross-examination his credibility was impeached by the Government when Wash-

ington testified that his alleged purchases more than exhausted the money he allegedly obtained by the loan. Thus, he failed to account for the $5.

Washington also testified with respect to the type of haircut he had at the time of his arrest as follows:

Q   And what type of haircut did you have at that time?

A   The same way I got it now.

Q   And that is?

A   It was close, close haircut.

Q   Now, do you know what an African bush haircut is?

A   Yes.

Q   Have you ever had occasion to let your hair grow in that fashion to have an African bush haircut?

A   No, sir.

The purpose of this testimony was to deny that on the day of his arrest he met the description of the purse snatcher given by Mrs. Cunningham as having "a lot of hair. His hair was long at that time." In reply to this the Government introduced a picture of Washington taken on the date of his arrest which they contended showed him with long hair cut in what was termed an African bush haircut. This issue also seemed to go against Washington.

The motion for judgment of acquittal was merely perfunctory as it was admitted there was sufficient evidence to go to the jury.

In its instructions to the jury the trial court had given a modified Allen charge but at 4:30 P.M. the jury reported they were a "hung jury." They were accordingly called back to the courtroom and given a form of the full Allen charge. To this appellant's counsel objected that the jury was getting the substance of the Allen charge on "two different occasions" since the court had already given a "somewhat modified version of the Allen charge before this jury went out. It is my understanding this would have been the proper time to give the Allen charge, rather than at this time, when

the jury went out." Shortly thereafter at 5 P.M., the jury reported a verdict of guilty.

## I

■ First, appellant contends that prejudicial error justifying a new trial occurred by reason of a delay of 8½ months *after* the trial of the court reporter in producing a transcript of the trial proceedings. The trial was completed on March 10, 1969, the notice of appeal was filed on April 11, 1969, the transcript was ordered on April 15th and filed on January 5, 1970. A supplemental transcript covering the instructions and proceedings after the jury announced they were hung was filed on May 25, 1970. It goes without saying that court reporters should "promptly transcribe the original records of the requested parts of the proceedings,"[1] but it does not follow that every failure to comply with this statutory direction is cause to set aside the judgment of conviction entered after a jury trial.

■ Before such result will occur there must be a showing that the delay caused substantial prejudice to the appellant. There is no such showing here that the resulting delay in any way affected the trial proceedings or appellant's substantial rights in any other way. Under such circumstances where appellant has not yet served his minimum sentence,[2] where it does not appear that any prejudice resulted to him in presenting his argument on appeal or in any other manner, and where we decide that

his conviction was otherwise valid, we consider the issue to be controlled by our decision in Blunt v. United States, 131 U.S.App.D.C. 306, 313, 404 F.2d 1283, 1290 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969)[3] which held that under closely similar circumstances the delay was not prejudicial.

We are not unmindful of the heavy burden placed on court reporters by the great demand for trial transcripts and of the delays occasioned thereby. Since we are also aware from the cases that have been coming before this court that our trial courts are taking proper steps to alleviate the situation and that in particular cases the court has brought proceedings calculated to expedite the production of transcripts, we do not press the point of which we know the trial court is fully aware.

## II

■ Appellant next attacks the propriety of giving a full Allen charge after a modified version of that instruction had previously been given and because the charge was given following a long period of deliberation when at 4:30 P.M. the jury reported itself deadlocked. We see nothing coercive in giving the charge in such circumstances. In *Fulwood*,[4] we upheld a similar charge where a modified version had been given in the original charge[5] and the jury had reported itself unable to agree. And since the approval of the Allen charge is a matter of long standing with this court and the Supreme Court,[6] we find nothing in the

1. The Court Reporters Act, 28 U.S.C. § 753.

2. Appellant was sentenced on April 11, 1969 to serve a term of imprisonment of from four to twelve years.

3. We have also reviewed our dicta in Holmes v. United States, 127 U.S.App. D.C. 332, 383 F.2d 925 (1967).

4. Fulwood v. United States, 125 U.S.App. D.C. 183, 185, 369 F.2d 960, 962 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967).

5. In United States v. McNeil, 140 U.S. App.D.C. 3, 4 n. 2, 433 F.2d 1109, 1110 n. 2 (1969), the charge was also upheld where the modified version of the Allen charge was given in the general charge.

6. The charge first appears in the law books 120 years ago in the Massachusetts case of Commonwealth v. Tuey, 8 Cush. 1 (1851). Thirty years later it was approved in Connecticut in State v. Smith, 49 Conn. 376, 386 (1881), and later by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 501–

circumstances that it was given late in the day to a hung jury that would create error. In fact, that seems an ideal time to give the charge.

### III

■ Finally, appellant contends that he was improperly prejudiced by the admission of the on-the-scene identification of him by the victim within less than 15 minutes after the crime.[7] He argues that a lineup should have been held and that the trial court should have acceded to his request for a pre-trial suppression hearing. However, in Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969), we upheld the right to conduct on-the-scene identifications in substantially similar circumstances and we see nothing in the fact that the arrest and confrontation here occurred at about 10:45 A.M. on a week day, whereas in Russell they occurred at 5 A.M., to require a different conclusion. Part of the underlying rationale that supports our decision in Russell is that the quick

---

502, 17 S.Ct. 154, 41 L.Ed. 528 (1896). More recently the Supreme Court has refused to overturn the Allen charge given in a capital case where the death sentence was adjudged for treason. Kawakita v. United States, 343 U.S. 717, 744, 72 S.Ct. 950, 96 L.Ed. 1249 (1952), aff'g 190 F.2d 506, 521–528 (9th Cir. 1951). The Allen charge has similarly been approved by this court, Fulwood v. United States, supra; United States v. McNeil, supra; and upheld but mildly criticized in United States v. Johnson, 139 U.S.App.D.C. 193, 197–201, 432 F.2d 626, 630–634 (1970), and see concurring opinion of Judge Robb, 139 U.S.App.D.C. 203, 204, 432 F.2d 636, 637.

The circumstances under which the Allen charge was given in Kawakita, supra, are outlined in the District Court opinion in United States v. Tomoya Kawakita, 96 F.Supp. 824 (S.D.Cal.1950). The case was submitted to the jury on Wednesday, August 25, 1948 after two months of trial and the jury deliberated on that day for 4 hours and 10 minutes. 96 F. Supp. at 831. On the following day, it had some of the transcript read to it in open court and deliberated for about 4 hours. 96 F.Supp. at 831, 852–853. On Friday, it deliberated for 7 hours. 96 F.Supp. at 832. On Saturday, it sent word at 3 P.M. that it was deadlocked. The court then advised it to deliberate further but gave it the rest of the day off. Until that point on Saturday, it had deliberated for 4 hours. 96 F.Supp. at 832. On Sunday, it did not deliberate. On Monday morning, a note was received from the foreman asking for advice. The jury was brought into court and it developed that personality conflicts had developed. The court then gave the Allen charge. 96 F.Supp. at 856–857. After the charge, it deliberated for 4½ hours. 96 F.Supp. at 833. On Tuesday, it deliberated for about 5 hours; on Wednesday for about 6 hours and on Thursday for about 5 hours. It returned a verdict on Thursday at 3:47 P.M. 96 F.Supp. at 833.

Additional pertinent circumstances are described in the Government's brief in the Supreme Court:

> The testimony had lasted two months and included a transcript of 5,000 pages from 60 witnesses, plus dozens of exhibits. Counsel had argued to the jury for four days. Thirteen overt acts of treason were submitted to the jury, requiring the consideration of 104 special interrogatories. The jury agreed on eight overt acts and 64 special interrogatories.
>
> *　　*　　*　　*　　*
>
> In aggregate, the labors of the jury totaled about 48 hours, over eight days' time (never over 7 hours, five minutes in one day, and with a complete day of rest on the intervening Sunday), including the various times spent in supplementary proceedings in the court room. (Government Brief p. 86)

It is obvious from the foregoing that the circumstances under which the charge was given in the instant case are pale when compared to those approved by the Court in Kawakita.

7. When we consider the on-the-scene arrest and identification of appellant, that he conformed to the description of him given by the victim prior to the arrest, that $5 was missing from the victim's stolen pocketbook and an unexplained $5 was found on appellant when arrested, and that appellant was identified by testimony as carrying the stolen pocketbook a few moments before his arrest, we do not consider that the question of identification was close. And see p. 312 infra.

confrontation permits the police to determine whether they have the actual offender and if not to continue their search for him and thus permit the prompt release of an innocent person. The ordinary on-the-scene confrontation also has great merit in that it operates at a time when the events and faces are fresh in mind and the accused ordinarily has no opportunity to change his clothing or personal appearance. All this is conducive to a high degree of accuracy in a form of identification that can at best be difficult when memories have been blurred by the passage of time and alleged suspects drastically change their appearance. Certainly, identifications conducted on the scene may contain certain elements of suggestiveness but this point can be argued to the jury. On the record here we find no undue suggestiveness in the confrontation and note the items of corroboration that support the identification. These include the facts (1) that the victim had an excellent opportunity to observe appellant before the crime and during its commission, (2) that she furnished the police with a complete and accurate description of appellant and his clothing,[8] (3) that he was observed carrying her pocketbook by the policeman who arrested him, (4) that he was fleeing when arrested, (5) that when arrested he had a $5 bill on his person that he could not satisfactorily account for (the victim testified her pocketbook had a $5 bill in it when it was snatched), and (6) that he gave no satisfactory explanation as to what he was doing when arrested.

As for appellant's contention that he was improperly denied due process by the trial court's refusal to hold a pretrial suppression hearing on the suggestiveness of the on-the-scene identification, we conclude that the argument on this point before the trial judge fully outlined the facts and the court properly ruled the evidence was admissible under Russell v. United States, *supra.*

Affirmed.

BAZELON, Chief Judge (dissenting):

I would reverse because the trial judge, over objection, delivered a second *Allen* charge late in the afternoon to a deadlocked jury while at the same time refusing appellant's request that the jury be told that it could adjourn and resume deliberations the next day if it did not shortly reach a decision.

Appellant was on trial for robbery. The main question, a close one, was whether appellant was the man who committed the crime.[1] At the close of the case, the jury was given a form of the *Allen* charge over appellant's objection.[2] At 4:30 p. m., some three to four hours after deliberations began,[3] the jury reported that it was deadlocked. The judge recalled the jury and, again over appellant's objection, gave it another version of the *Allen* charge. Appellant's attorney then asked that the jury be instructed that if it did not reach a verdict by

---

8. Appellant disputed the victim's description of his hair and the clothes he was wearing, but the police officers corroborated the testimony of the victim. Under such circumstances the issue was for the jury who evidently decided it adversely to appellant.

1. There was a conflict in the descriptions of appellant's clothing and the length of his hair; there was testimony from which the jury could have found that appellant was identified by a very distraught woman; and according to the police report the complainant first said she had $5 in bills in her purse, although she later testified that she had a $5 bill. And last but not least, since the jury was deadlocked, it must have found the question a close one.

2. Essentially the judge gave the Junior Bar Section's Instruction 41. *See* Junior Bar Section, Bar Association of the District of Columbia, Criminal Jury Instructions for the District of Columbia 23–24 (1966).

3. It is not clear from the record how long the jury deliberated before announcing that it was deadlocked. The estimate in text is from appellant's brief, and the Government did not dispute this point.

5:00 p. m., the jurors would be permitted to go home and resume deliberations the next day. The judge refused. At 5:00 the jury returned with a verdict of guilty.

This case was tried before our prospective ban on the *Allen* charge.[4] Accordingly, its use here, standing alone, does not require reversal. "However, since the charge is potentially coercive, its content and manner of use deserve scrutiny."[5] In such scrutiny I find several factors which clearly add up to a level of coercion which is intolerable.[6] In the first place, the jury was twice told that "if the larger number of jurors are for conviction, a dissenting juror should consider carefully whether his doubt is a reasonable one when it makes no impression upon the minds of so many jurors equally honest and equally intelligent with * * * himself."[7] Further, the judge gave the second charge after the jury had reported itself deadlocked. The Tenth Circuit deemed this particular use of the charge so likely to be coercive that it will tolerate the charge only as part of the initial instructions to the jury.[8] Third, the trial judge added as part of the second charge the following coercive statement:

You should consider that the case must at some time be decided, that you were selected in the same manner and same source for which any further jury may be, and there is no reason to suppose that the case will ever be submitted to 12 jurors more intelligent, more impartial or more competent to decide it, or that more or clearer evidence have been produced on one side or the other, and with this view it is your duty to decide the case if you can reasonably do so.

The fact of the matter is, however, that the case might never have to be decided. As we noted in United States v. Johnson,[9] "[t]he question of whether a mistrial will or will not be followed by a renewed prosecution is so speculative that nothing should be said on the matter either way."

In light of the foregoing, a fourth and final factor is decisive for me: the trial judge's rejection of defense counsel's request that the jury not be left with the impression that it would be held in the courthouse into the night until it reached a decision. The request was denied without benefit of reasons, and, as appellant feared, the jury deliberated only a very short time before re-

---

4. United States v. Thomas, No. 22,768 Nov. 6, 1970). *See also, e. g.,* United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1970) ; United States v. Brown, 411 F.2d 930 (7th Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970).

5. Moore v. United States, 120 U.S.App. D.C. 203, 204, 345 F.2d 97, 98 (1965).

6. *Cf.* Green v. United States, 309 F.2d 852 (5th Cir. 1962). *See* also United States v. Sawyers, 423 F.2d 1335, 1347 (4th Cir. 1970) (Sobeloff, J., dissenting).

7. The jurors were also told, of course, that "if the majority are for acquittal, the minority ought to ask themselves seriously whether they might not reasonably doubt the correctness of a judgment which is not concurred in by most of those with whom they're associated."

It is worth noting that this charge is far more coercive than the American Bar Association charge which will be used in this circuit in the future. *See* United States v. Thomas, *supra* note 4, at 14 n. 46. As we said in United States v. Johnson, 139 U.S.App.D.C. 193, at 198–199, 432 F.2d 626, at 631–632 (1970), the ABA charge is preferable to the *Allen* charge because "it is relatively free of potentially coercive references, does not tend to place proponents of a minority view in a vulnerable position, and does not perpetuate the unfortunate fiction that, in case of a mistrial, another jury will inevitably be assembled to consider the case."

8. United States v. Wynn, 415 F.2d 135 (10th Cir. 1969), cert. denied, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970).

9. *Supra* note 7, 139 U.S.App.D.C. at 199 n. 7, 432 F.2d at 632 n. 7.

turning with a guilty verdict.[10] This denial sharply distinguishes this case from Fulwood v. United States,[11] relied on by the majority, where we noted that the possible coerciveness of the *Allen* charge was largely dissipated by the fact that the jury was permitted to go home after the charge and to reconvene the next morning.[12]

Robb, Circuit Judge, concurred in result only.

10. *Compare* Webb v. United States, 398 F.2d 727 (5th Cir. 1968).

11. 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. denied 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967).

12. *Cf.* United States v. Johnson, *supra* note 7, 139 U.S.App.D.C. at 200, 432 F.2d at 633.