### UNITED STATES of America
### v.
### Anthony C. THOMAS, Appellant.
### No. 22768.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 26, 1969.

Reargued En Banc Feb. 26, 1971.

Decided Sept. 14, 1971.

---

Mr. John B. Kenkel, Washington, D. C., (appointed by this Court) for appellant.

Mr. Harvey S. Price, Asst. U. S. Atty., for appellee. Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Roger E. Zuckerman, Asst. U. S. Attys., also entered appearances for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON,

ROBB, and WILKEY, Circuit Judges, sitting en banc.

On Rehearing En Banc

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellant was convicted by a jury on both counts of an indictment respectively charging assault with a dangerous weapon and robbery.[1] His sentence was a commitment pursuant to provisions of the Federal Youth Corrections Act.[2] His sole contention on this appeal is that the conviction was vitiated by a series of trial events, including prominently a version of the *Allen* charge,[3] which in his view improperly induced the verdict the jury returned.

Upon careful consideration of the record, we conclude that the conviction should be reversed, and that future rendition of *Allen*-type charges must conform to the standard which has been approved by the American Bar Association and adopted by the Third and Seventh Circuits.[4] Our reasons for these conclusions follow a summary of the relevant facts.

I

James C. Drayton, Jr., was the victim of an armed assault and an accompanying robbery · at his apartment in the early hours of a February morning. Shortly after midnight, awakened by the sound of broken glass and footsteps, he went into his kitchen in time to see two men hastily exiting through the back door.[5] A police investigation of the in-cident apparently was unfruitful, and Drayton returned to bed about 5:00 a. m. He was again aroused about 6:30 a. m. by a knock on his front door, and in response to his inquiry as to who was there, a male voice answered "Annette's brother." Drayton opened the door because, in his words, "I figured after he said Annette's brother, I knew Annette." [6]

Two men entered the apartment, then still unlighted, and one, later identified as appellant, promptly knocked Drayton down with a blow to the head. As Drayton lay face down to the floor with the same man standing over him with a pistol, and later with Drayton's own shotgun,[7] the other man[8] gathered money and articles of value in the apartment. While the ransacking was in progress, Drayton attempted to arise, and was again struck in the head, this time with the shotgun. A struggle for the shotgun ensued, and Drayton commenced shouting, whereupon the two men left the apartment with part of their collected loot.

The police were again summoned to Drayton's apartment. Drayton was taken to a hospital, where cuts about his head were stitched, and on his return he gave the police the relevant details. Accompanied by Drayton, the police went to the apartment of Annette Thomas, whom he knew, but no one was there. Somewhat later the same day, after some sleuthing on his own, Drayton learned that Miss Thomas had a brother, our appellant, whose address Drayton also procured. There appellant was ar-

---

1. D.C.Code §§ 22–502 (1967), 22–2901 (Supp. I 1968).

2. 18 U.S.C. § 5010(b) (1964). See note 67, *infra*, and accompanying text.

3. So named after receiving approbation by the Supreme Court in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

4. See Part IV, *infra*.

5. Drayton saw only the backs of the men, and they were never identified.

6. Drayton knew an Annette Thomas, as subsequently appears in text, but was not acquainted with her brother. At the trial, Drayton testified that although, on a previous occasion, a man at Miss Thomas' apartment had been pointed out as "Annette's brother," he would not have recognized the brother at the time of the offenses.

7. The shotgun, found in Drayton's bedroom by the other man, was handed over to the one who had knocked Drayton down.

8. Never identified and apparently never apprehended.

rested, and was identified by Drayton as one of his assailants.[9]

Such was the case portrayed by the Government's evidence at trial and, save for appellant's identity as a participant in the offenses, it was uncontested. Appellant denied his complicity in the affair, asserting that he was at home in bed when the offenses were committed, and in this claim he was partially corroborated by the testimony, of his mother and a cousin. A motion for a judgment of acquittal, made initially on completion of the Government's case in chief and renewed when all the evidence was in, was denied.

The trial judge included among his instructions to the jury, before its retirement for deliberations, some of the ingredients of the *Allen* charge. In that aspect the judge counseled the jury as follows:

> In a large portion of the cases absolute certainty cannot be expected, although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of your fellow jurors, yet you should examine the question submitted with candor and proper regard and deference for the opinion of each other. It is your duty to decide the case if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced. If much the larger number of jurors are

for conviction, a dissenting juror should consider whether his doubt is a reasonable one which makes no impression upon the minds of so many jurors equally honest, equally intelligent with himself.

> If on the other hand the majority are for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by the majority.

After the jury had deliberated about an hour, it sent to the judge a note advising that "[w]e, the jury, cannot come to an agreement." Thereupon, in the jury's absence, the judge, expressing the view that "[t]his is not a case we should have to retry," informed counsel of his intention to excuse the jurors for the day [10] but to reconvene them on the following day for further deliberations; and this course the judge pursued, over vigorous objection by defense counsel. The jury was returned to the courtroom,[11] whereupon the judge announced that he was "not going to declare a mistrial, and thereby require a retrial of this case before some other jury." [12] Rather, he explained, he was excusing the jurors at that time to "come back tomorrow morning at 9:30 with a fresh mind and a night's sleep and seek to reach a verdict about the matter one way or the other." [13] He added that he was "sure you ladies and

9. See note 65, *infra.*

10. It was quite late in the day. The record reveals that it was 5:24 p. m. when the jury was actually excused.

11. What transpired from then on, later summarized in text, was:

> THE COURT: Mister Foreman, the Court has your note and has read its contents to counsel and the defendant and has decided to excuse the jury at this time. I am not going to declare a mistrial, and thereby require a retrial of this case before some other jury. What I am going to do is to ask you, members of the jury, to break off your consideration of the case at this time. Don't discuss the case among yourselves, don't talk to anybody else about it, and don't let anybody talk to you

> about it, but come back tomorrow morning at 9:30 with a fresh mind and a night's sleep and seek to reach a verdict about the matter one way or the other.

> I am sure you ladies and gentlemen know we have a substantial backlog of work, and to spend another day before another jury retrying this case just doesn't make sense to me. See if you can't decide and come to a verdict, think about it overnight individually.

> So, ladies and gentlemen, you are excused with that admonition until tomorrow morning at 9:30. Report to [the marshal]. Don't start your deliberations until all twelve of you are present.

12. See note 11, *supra.*

13. See note 11, *supra.*

gentlemen know we have a substantial backlog of work, and to spend another day before another jury retrying this case just doesn't make sense to me." [14] He again admonished the jurors to "[s]ee if you can't decide and come to a verdict, think about it overnight individually." [15]

The jury reconvened at the appointed time. After about two hours of deliberations, interfused with an in-courtroom rereading of Drayton's testimony at its request, it returned a verdict finding appellant guilty on both counts of the indictment. This appeal followed.

## II

Every defendant in a federal criminal case has the right to have his guilt found, if found at all, only by the unanimous verdict of a jury of his peers.[16] Any undue intrusion by the trial judge into this exclusive province of the jury is error of the first magnitude. When efforts to secure a verdict from the jury reach the point that a single juror may be coerced into surrendering views conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted.[17] It is against these considerations that

we must evaluate any judicial effort to avoid or break a deadlocked jury.

The trial judge is, of course, under a duty to lend guidance to the jury through instructions as to the governing principles of law, including those which define for the jurors their obligations as jurors. It was quite, obviously, in an attempt to enlighten the jury in the latter regard that the judge embraced some of the *Allen* admonitions within his charge. But the line separating proper guidance from improper coercion is fine, and its precise location. is not always clear. In the case before us, however, the judge urged a verdict, not only through *Allen* admonitions, but by other expressions to the jury as well. The issue appellant presents is whether in toto the urging—the individual elements of which we examine separately—was so great as possibly to exert a coercive influence upon the jury.

Just four years ago, in Fulwood v. United States,[18] this court upheld an application of the *Allen* charge against claims that it was coercive, not only per se but also in the form and under the special circumstances given.[19] However, the court indicated the desirability of avoiding variant formulations and urged

---

14. See note 11, *supra*.

15. See note 11, *supra*.

16. Fed.R.Crim.P. 31(a); Billeci v. United States, 87 U.S.App.D.C. 274, 283, 184 F. 2d 394, 403, 24 A.L.R.2d 881 (1950). See, generally, Hibdon v. United States, 204 F.2d 834 (6th Cir. 1953), and cases cited therein. See also Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948); Maxwell v. Dow, 176 U.S. 581, 586, 20 S.Ct. 494, 44 L.Ed. 597 (1900); American Publishing Co. v. Fisher, 166 U.S. 464, 468, 17 S.Ct. 618, 41 L.Ed. 1079 (1887).

17. *E. g.*, Hibdon v. United States, *supra* note 16, 204 F.2d at 838.

18. 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967).

19. *Id.* at 185–186, 369 F.2d at 962–963. Variations from the *Allen* opinion were statements (a) that a juror should "dis-

trust his judgment" upon finding a different view by the large majority; (b) that "if much the larger number of jurors are for acquittal" or "if the majority of the jurors are for conviction," minority jurors should reexamine their position; and (c) that "some jury some time will have the duty to decide this case, and I hope that you, as the jury in this case, will be able to decide this matter." *Id.* The circumstances complained of were (a) that the trial judge in his original charge included portions of *Allen* "describing the duty of jurors to keep an open mind and to weigh the arguments of their peers," *id.*, and repeated them in a supplemental charge containing *Allen* in full; and (b) that the judge allowed the jury to separate and recess overnight after the first *Allen* rendition. *Id.* at 185, 369 F.2d at 962. The court stated that this separation and recess was less coercive on the jury than a charge immediately followed by sequestration and deliberation. *Id.*

that the trial judges "consistently use a form of instruction plainly within *Allen*".[20] Besides, we have also acknowledged that the charge, even when unembellished by further exhortations, is "potentially coercive;"[21] that "its content and manner of use deserve scrutiny." [22] We are mindful, too, of "the widening challenge" [23] to the charge, even in its pristine text, by an increasing—and increasingly concerned—corps of critics.[24]

Moreover, we have had occasion to warn that the *Allen* charge "approaches the limits to which the court should go in suggesting to jurors the desirability of agreement and avoidance of the necessity of a retrial before another jury." [25] We are aware of holdings that in particular formulations or under particular circumstances the charge may indeed be coercive;[26] in Williams v. United States,[27] we ourselves reversed a conviction following an *Allen* charge importing new ingredients and given after the judge's inquiry as to whether there was "a clear minority" of jurors.[28] Where, as here, comments to the jury are both *Allen*-plus[29] and *Fulwood*-plus,[30] the situation demands close examination to determine whether under all circumstances it is likely to have been coercive.

## III

■ Improper duress upon a deadlocked jury does not seek its only source in threats of physical abuse.[31] Communications from judge to jury are unduly constraining whenever they possess a substantial propensity for prying individual jurors loose from beliefs they honestly have.[32] The jury is coerced, the Supreme Court has held, when it is told that "[y]ou have got to reach a decision in this case," [33] and in much the

---

20. *Id.* at 186, 369 F.2d at 963.

21. Moore v. United States, 120 U.S.App.D.C. 203, 204, 345 F.2d 97, 98 (1965). See also Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962).

22. Moore v. United States, *supra* note 21, 120 U.S.App.D.C. at 204, 345 F.2d at 98. Compare Williams v. United States, 119 U.S.App.D.C. 190, 193, 338 F.2d 530, 533 (1964).

23. United States v. Johnson, 139 U.S.App.D.C. 193, 197, 432 F.2d 626, 630, cert. denied, 400 U.S. 949, 91 S.Ct. 257, 27 L.Ed.2d 255 (1970).

24. See the listing *id.* at 197 n. 5, 432 F.2d at 630 n. 5.

25. Williams v. United States, *supra* note 22, 119 U.S.App.D.C. at 193 n. 4, 338 F.2d at 533 n. 4, quoting United States v. Rogers, 289 F.2d 433, 435 (4th Cir. 1961).

26. See United States v. Meisch, 370 F.2d 768, 774 (3d Cir. 1966); United States v. Rogers, *supra* note 25, 289 F.2d at 435–437.

27. *Supra* note 22.

28. 119 U.S.App.D.C. at 191–193, 338 F.2d at 531–533.

29. See, *e. g.*, Rice v. United States, 356 F.2d 709, 715, 717 (8th Cir. 1966).

30. See notes 18–19, *supra*, and accompanying text.

31. "By the ancient common law, jurors were kept together as prisoners of the court until they had agreed upon their verdict;" and this required that they be "kept without meat, drink, fire, or candle, unless by permission of the judge, till they are all unanimously agreed." People v. Sheldon, 156 N.Y. 268, 50 N.E. 840, 842 (1898). Such practices have found occasional use in more modern times. *E. g.*, Pope v. State, 36 Miss. 121 (1858) (no food); Mead v. City of Richmond Center, 237 Wis. 537, 297 N.W. 419, 421 (1941) (no heat). See, generally, Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 103–04 n. 16, 140–41 (1968); Note, Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123 (1967).

32. See, *e. g.*, Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

33. *Id.* at 446, 85 S.Ct. at 1060. See also United States v. Davidson, 367 F.2d 60, 65 (6th Cir. 1966) (concurring opinion) (trial judge's statement that in 24 years of judicial service he had "never turned one [nonjury case] back yet that I couldn't decide"); Rice v. United States, *supra* note 29, 356 F.2d at 715, 717–718 (judge's response to jury's inquiry, as to whether it could be "undecided" as to certain counts, advising that the "defendants must be found either guilty or not guilty on each count.").

same category is the admonition in this case that "you ought to be able to agree on a verdict."[34] Statements of this sort reflect the judge's assessment that the factual issues bear relatively easy resolution, and pressure jurors, who in their own endeavors have not found it so, to come to some result at all costs.

So also, in somewhat similar fashion, do expressions emphasizing the desirability of achieving a verdict as a means of avoiding the necessity of a retrial.[35] Equally pressuring are statements susceptible to an interpretation reflecting unwholesomely upon minority jurors simply because they happen to be in the minority.[36] "No juror should be induced to agree to a verdict by a fear that a failure so to agree will be regarded by the public as reflecting upon either his intelligence, or his integrity."[37]

■ The record before us portrays the sequence of events which in combination generated, in some measure, each of these undesirable elements. When the jury first announced its inability to agree, the judge had already given a "potentially coercive"[38] *Allen* instruction, and his further efforts to solicit a verdict entered the realm of *Allen*- and *Fulwood*-plus. The judge's initial response to the jury's announcement of a deadlock was a declaration that he was "not going to declare a mistrial, and thereby require a retrial of this case before some other jury."[39] He referred, too, to the court's "substantial backlog of work," and voiced the feeling that "to spend another day before another jury retrying this case just doesn't make sense to me."[40]

It seems not unlikely that jurors faithful to their oaths might have been troubled in attempting to reach a verdict on the proof introduced at the trial. The crucial issue was the identity of one of Drayton's attackers, ostensibly the one who said he was "Annette's brother" immediately prior to the attack. The Government's case against appellant rested on Drayton's identification, but appellant presented a corroborated alibi for the time of the crimes. The jury had to ponder the credibility of the witnesses as well as judge the reliability of the victim's identification in the face of the suggestive and perhaps improbable self-identification attributed to appellant.[41] Equivocal evidence can raise problems for conscientious jurors, and increase their susceptibility to judicial prodding for a verdict they seem otherwise unable to reach.[42]

Particularly in these days of burgeoning litigation, we share the trial judge's sensitivity to the need for adjustment of

34. Powell v. United States, 297 F.2d 318, 320 (5th Cir. 1961). See also Kesley v. United States, 47 F.2d 453, 454 (5th Cir. 1931) (judge's statement that "it is apparent to the court that some of you have forgotten that part of the charge of the court as to your oaths as jurors," and that "[i]t does not seem to me that there is very much doubt as far as the facts are concerned.").

35. See United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 198–199, 432 F.2d at 631–632; United States v. Smith, 303 F.2d 341, 342–343 (4th Cir. 1962).

36. Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926) (inquiry as to how jury stood numerically); Williams v. United States, *supra* note 22, 119 U.S.App.D.C. at 191–193, 338 F.2d at 531–533 (jury foreman's question to trial judge in open court as to whether "the [two] alternate jurors [could] replace the minority voters," and his affirmative response to judge's inquiry as to whether there was "a clear minority") ; Powell v. United States, *supra* note 34, 297 F.2d at 320 (judge's statement that "it is no credit to a juror to stand out in a pure spirit of stubbornness because he has taken a position").

37. Kesley v. United States, *supra* note 34, 47 F.2d at 454, quoting State v. Bybee, 17 Kan. 462, 466–467 (1877).

38. Text *supra* at note 21.

39. See note 11, *supra*.

40. See note 11, *supra*.

41. See note 65, *infra*. It is not surprising, then, that the jury requested a rereading of Drayton's testimony.

42. See Note, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 142 (1968).

judicial processes to the point of highest efficiency. But while there is need to expedite the work of the courts, this cannot be at the expense of the call of conscience. Indeed, it may well be that a hung jury might lead the prosecutor to reconsider whether the case, particularly a close or weak case, should be presented again to a jury—so that a mistrial need not necessarily "require" a retrial, as the trial judge told the jurors.[43] We have no doubt whatever that the judge acted out of the best of motives, and that any coercion of the jury was entirely unintended. The events transpiring, however, invoke our responsibility to appraise the activities complained of, not by the good intentions behind them, but in terms of their probable impact upon the jury. All circumstances considered, we think those activities strayed beyond legitimate bounds, with a substantial probability of prejudice to the accused, and with the result that the judgment of appellant's conviction cannot stand.

## IV

■ Our conclusion that the conviction must be reversed for actual, though undesigned, coercion of the jury is an appraisal we could make only after a very considerable expenditure of judicial time and energy. And even as we view in retrospect the demands of this case, we realize, from the number of *Allen*-charge complaints reaching this court, that they are not unique, but frequently recur. So it is that the drain on appellate resources made by *Allen*-charge controversies leads us to focus upon means whereby the seemingly inevitable aberrations of the charge can be reduced or eradicated.

In our recent *Johnson* opinion,[44] we examined and expressed our approval of the American Bar Association's standard for treatment of the problem of deadlocked juries[45] and a form of instruction it deemed harmonious therewith.[46] We need not repeat the compre-

---

43. See note 11, *supra.* See also note 71, *infra.*

44. *Supra* note 23.

45. American Bar Association, Standards Relating to Trial by Jury 145–46 (1968), hereinafter cited ABA Jury Standards:
§ 5.4 Length of Deliberations; deadlocked jury.
(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:
(i) that in order to return a verdict, each juror must agree thereto;
(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and
(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonabe lenghth of time or for unreasonable intervals.
(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

46. W. Mathes, Jury Instructions and Forms for Federal Criminal Cases, Instruction 8.11, 27 F.R.D. 39, 97–98 (1969):
The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views

hensive discussion in that opinion; it suffices to remind that we isolated, as "[a] prime consideration motivating the promulgation of the ABA Standard * * * the large amount of litigation which the use of the original *Allen* charge has engendered." [47] We pointed out that "[o]ne of the sources of trouble on appeal has been that the language actually used tends to vary from judge to judge, and this lack of uniformity in a delicate context is full of pitfalls." [48] We took a hard look at "the majority-minority element of the Allen charge" [49]— advising that minority jurors owe deference to the majority—which two sentences of the charge before us featured. We noted that abandonment of this element "may well be in the interest of the efficient administration of justice" because that "would avoid recurring controversies, turning upon subtle questions of coercion in the context of each case." [50]

Further use of the *Allen* charge in usual form has been banned in two federal circuits by exertions of supervisory authority. [51] In United States v.

Fioravanti, [52] the Third Circuit, characterizing use of the charge as "an invitation for perennial appellate review," [53] outlawed prospectively the "majority-minority" instruction partly because of "the profound difficulty in confining its use within just and equitable bounds," [54] and recommended a model similar to the ABA-endorsed instruction for use by judges disposed to charge jurors on consultation *inter sese*. [55] In United States v. Brown, [56] the Seventh Circuit, influenced by the administrative difficulties associated with *Allen*-type charges, [57] decided that "it would serve the interests of justice to require under our supervisory power that, in the future, district courts within this Circuit when faced with deadlocked juries comply with the" ABA standard. [58] Two state courts, for substantially similar reasons, have proscribed the *Allen* charge on supervisory grounds. [59]

A decade ago, the Supreme Court of Arizona declared "that the evils [of the *Allen* charge] far outweigh the benefits." [60] Our opinion in *Johnson*

---

and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

47. United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 199, 432 F.2d at 632. See also ABA Jury Standards, *supra* note 45, at 154–56.

48. United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 199, 432 F.2d at 632.

49. *Id.* at 200, 432 F.2d at 633.

50. *Id.*

51. United States v. Fioravanti, 412 F.2d 407 (3d Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969) ; United States v. Brown, 411 F.2d 930 (7th Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970).

52. *Supra* note 51.

53. United States v. Fioravanti, *supra* note 51, 412 F.2d at 420.

54. *Id.*

55. *Id.* at 420 n. 32.

56. *Supra* note 51.

57. 411 F.2d at 933.

58. *Id.*

59. State v. Thomas, 86 Ariz. 161, 342 P.2d 197, 200 (1959) ; State v. Randall, 137 Mont. 534, 353 P.2d 1054, 1058 (1960).

60. State v. Thomas, *supra* note 59, 342 P.2d at 200. As the court explained:
When and wherever its use is called into question it must stand or fall upon the facts and circumstances of each particular case. It has given, and we believe each use will give us, harassment and distress in the administration of justice. No rule of thumb can circumscribe definite bounds of when and where, or under what circumstances it should be given or refused.

*Id.* See also Andrews v. United States, 309 F.2d 127, 129 (5th Cir. 1962) (dissenting opinion) ; ABA Jury Standards, *supra* note 45, at 154–156; Note, Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge, 53 Va.L.Rev. 123, 144–149 (1967).

made it clear that we felt exactly the same way.[61] There, we advanced the ABA standard and its implementing instruction as recommendations to trial judges.[62] Upon further reflection, and in light of the additional circumstances presented by the case at bar, we think it is in furtherance of the interest of justice to take a step which the court was not ready to take in the circumstances of *Johnson,* and to exercise our supervisory power, with a generally prospective ruling, to require trial judges to comply with the ABA standard.

We have already noted that in *Fulwood,* Judge (now Chief Justice) Burger urged the trial bench to "consistently use a form of instruction plainly within *Allen.*"[63] Yet, in the course of time, the expressions actually used by trial judges, in this case and others, have added an extra measure of influence in the instructions given to juries. We believe that appellate courts should no longer be burdened with the necessities and niceties—and the concomitant uncertainties—of gauging various *Allen*-type renditions in terms of the coerciveness of their impact. We are persuaded, too, by the volume and complexity of litigation generated by the *Allen* charge, that its continued unrestricted use is incompatible with sound judicial administration. We have before us today what was not available when *Fulwood* issued —the standard that was painstakingly

reviewed and approved by the designated committee of the American Bar Association's Project on Minimum Standards for Criminal Justice, that was adopted by its House of Delegates, and that was mandated by opinions of the Third and Seventh Circuits. We think the time has come to follow the path they have traveled and lay down the same mandate.

The case at bar, unlike *Johnson,* presents the occasion we deem appropriate for doing so. With the court now convened *en banc,* supervisory jurisdiction is clear,[64] and the situation before us underscores the impositions which *Allen* charges in usual script can make for. The contention on this appeal was not, as in *Johnson,* confined to the content of the trial judge's *Allen* instructions, but extended beyond to a close and difficult issue of coercion in fact under the surrounding circumstances. That issue we have resolved, but the process has exacted a heavy toll in terms of judicial time and effort, and even so its contribution to the ultimate disposition of this litigation is uncertain. There remains in the case a serious problem as to whether any new in-court identification of appellant by Drayton could survive a one-man showup at which appellant, without counsel and 24 hours after the offenses were committed, was first identified as a participant.[65] While we do not undertake decision of that question,[66] the is-

61. United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 199, 200–201, 432 F.2d at 632, 633–634.

62. *Id.* at 199, 432 F.2d at 632.

63. Text *supra* at note 20.

64. Compare United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 200–201, 432 F.2d at 633–634.

65. The record discloses that after appellant was apprehended in his bedroom, Drayton, the victim, was brought in, and that he there identified appellant as one of his assailants. This one-man showup occurred about 24 hours after the crimes were committed, and no special necessity for a showup at that time or place appears, nor is there any indication that appellant had counsel or was warned that he had a

right to counsel. At the trial, Drayton identified appellant from the witness stand, and testified to his earlier identification at appellant's house. The showup occurred after the decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and in any event might call for careful judicial scrutiny under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

66. The question was raised at appellant's trial, but not on this appeal. But see Fed.R.Crim.P. 52(b). The record presently before us in incomplete on that score and we could not now explore the question without first remanding for amplification. *E. g.,* Sera-Leyva v. United

sue will be open in the event of another trial following our remand. Furthermore, the record reveals that appellant was conditionally released from the commitment imposed by his sentence before the briefs on this appeal could be filed.[67]

While we do not intimate a view as to what more can or should be done in this case, we are permitted the realism of doubting whether further proceedings would actually eventuate, especially if a new trial is required. We conclude that the interest of justice will in the future be better served, not by periodically laboring the refinements of *Allen*-charge language or coerciveness concepts, but by adherence to the broader and sounder doctrine, which was recommended but left permissive in *Johnson* for the time being, as a requirement governing instructions given by trial judges to juries subsequent to the date of this *opinion.*

Accordingly, in the exercise of our supervisory power over the administration of the law in this circuit,[68] we adopt the ABA standard[69] for the guidelines which future renditions of *Allen*-type charges must abide, and the ABA ap-

proved instruction[70] as the vehicle for informing jurors of their responsibilities in situations wherein judges decide to do so.[71] This new rule, "[a]s a prophylactic device to eliminate future vexation,"[72] will benefit only those whose jury trials are conducted hereafter,[73] including, of course, any retrial to which appellant may be subjected.[74]

We do not regard this holding as a reconsideration or overruling of our decision in *Fulwood.*[75] We have not held that the *Allen* charge is per se coercive; rather, we have predicated our decision on the needs of judicial administration, a ground which, as *Johnson* points out, *Fulwood* did not consider, but which commended itself to the American Bar Association.[76] What we say, in sum, is that the time has come "to focus [the *Allen*] charge on its major function of counseling the jury to consult open-mindedly with a disposition to hearken to fellow-jurors, and to agree when no violation of conscience is involved."[77] That objective, we are convinced, can become a reality only through the supervisory exercise in which we engage today.[78]

States, 133 U.S.App.D.C. 125, 127, 409 F.2d 160, 162 (1969); Wright v. United States, 131 U.S.App.D.C. 279, 284, 404 F.2d 1256, 1261 (1968).

67. As we have stated, text *supra* at note 2, appellant was sentenced under the provisions of 18 U.S.C. § 5010(b) (1964). It appears that lack of a prior adult record influenced the decision making possible his early conditional release from confinement.

68. Like the Seventh Circuit, "[w]e perceive no distinction between criminal and civil cases," United States v. Brown, *supra* note 51, 411 F.2d at 934 n. 4, and our ruling applies equally to both.

69. *Supra* note 45.

70. *Supra* note 46.

71. As we made clear in United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 200, 432 F.2d at 633, the ABA standard does not bar the use of *Allen*-type charges, either before or after deadlock, but only eliminates the "majority-minority" element from the usual *Allen* text. And since, as we noted in *Johnson,* 139

U.S.App.D.C. at 200, 432 F.2d at 633, many trial judges have long since discarded this element, a uniform ban on its use would not make as much of a change as might be thought. Moreover, as *Johnson* also points out, 139 U.S.App.D.C. at 200 and n. 10, 432 F.2d at 633 and n. 10, references to possible retrial in the event of a hung jury, sometimes included in *Allen* renditions but omitted from the ABA model, do not appear in the charge as approved by the Supreme Court in *Allen.*

72. United States v. Fioravanti, *supra* note 51, 412 F.2d at 420.

73. Compare *id.*; United States v. Brown, *supra* note 51, 411 F.2d at 934.

74. See United States v. Bass, 425 F.2d 161, 164 (7th Cir. 1970).

75. *Supra* note 18.

76. United States v. Johnson, *supra* note 23, 139 U.S.App.D.C. at 200, 432 F.2d at 633.

77. *Id.*

78. In Fulwood v. United States, *supra* note 18, it was observed that "considerable

At oral argument the Government, anticipating that we might modify our rule, proposed that we not adopt the ABA-approved instruction but instead accept a variant wording.[79] Our initial reaction is that the wording proposed is not a major improvement. Perhaps further study would confirm that initial view. But we are not disposed to open the door to variants in language, having in mind that it was through just such a process that the courts were led into the increasing difficulties we outlined earlier in this opinion. We do not consider the ABA's standard or its model instruction as graven in stone. The Judicial Conference for this circuit has approved the concept of a committee to implement the ABA's criminal justice standards,[80] and it may be that in due course some modification will emerge as appropriate, either by virtue of general reconsideration or the need for adaptation to local conditions. But we think if there is to be any change in wording, it should be one that is carefully considered on a broad basis by a broadly representative body, like the ABA committee, that can make a wide-ranging inquiry as to the necessity for and possible consequences of modification. Accordingly, we decline acceptance of the Government's proposal.

The judgment of appellant's conviction is reversed, and the case is remanded to the District Court for such further proceedings, if any, as may be consistent with this opinion.

Reversed and remanded.

ROBB, Circuit Judge (dissenting):

The majority finds that the verdict of the jury was coerced by the district judge; specifically, it finds coercive influences in the *Allen* charge given by the judge, together with his remarks after the jury had reported its inability to agree. Having reversed the conviction on this ground the majority then goes further and outlaws the *Allen* charge, in favor of an instruction recommended by the American Bar Association. I disagree with both conclusions of the majority.

It cannot be said that the giving of the *Allen* charge, standing alone, was error. That charge was approved by the Supreme Court of the United States in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). It was again approved by the Supreme Court in Lias v. United States, 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505 (1931), aff'g 51 F.2d 215 (4th Cir.), and in Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952), aff'g 190 F.2d 506 (9th Cir. 1951), a capital case.

It was approved by this court in an opinion by Circuit Judge Burger in Fulwood v. United States, 125 U.S.App.D.C. 183, 369 F.2d 960 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d

---

work for this court would be eliminated if District Judges would consistently use a form of instruction plainly within *Allen.*" 125 U.S.App.D.C. at 186, 369 F.2d at 963. The cases which have subsequently come before this court attest vividly the fact that this has not been done. And, of course, adherence even precisely to the charge as approved in *Allen* would not alone solve the problem, for there would continually remain questions as to whether in the particular circumstances involved the giving of an *Allen*-type charge was legally warranted. See ABA Jury Standards, *supra* note 45, at 155–156.

79. The proposal is also tantamount to a suggestion that we similarly modify the ABA standard. Comparison of the standard and the implementing instruction, notes 45–46, *supra*, demonstrates their complete congruence, and it is obviously impossible to meaningfully change the language of the instruction without effecting substantive change in the standard itself.

80. The Conference action, taken in 1970, established a continuing committee to bring to the attention of the courts and other agencies concerned such of the ABA-recommended standards as the committee after study believes suitable and desirable for implementation.

996 (1967), and again in an opinion by Circuit Judge Robinson in Post v. United States, 132 U.S.App.D.C. 189, 190 n. 3, 407 F.2d 319, 320 n. 3 (1968), cert. denied, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969).

In 1970 we three times declined to hold that use of the charge was error and in two of these cases the Supreme Court denied certiorari. United States v. Orsinger, 138 U.S.App.D.C. 403, 428 F.2d 1105, cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970); United States v. Johnson, 139 U.S.App.D.C. 193, 432 F.2d 626, cert. denied, 400 U.S. 949, 91 S.Ct. 257, 27 L.Ed.2d 255 (1970); United States v. Simpson, 144 U.S.App.D.C. 259, 445 F.2d 735, decided November 17, 1970. Moreover, it is agreed by counsel that in the past five years, in more than a score of cases from other circuits, the Supreme Court by denial of certiorari has rejected challenges to the *Allen* charge.[1] Since the Supreme Court has not disavowed the charge it is not for us to do so. See Hodges v. United States, 408 F.2d 543, 552 (8th Cir. 1969) (opinion by Blackmun, Circuit Judge).

As we observed in United States v. Simpson, No. 23,269, 144 U.S.App.D.C. 259, 445 F.2d 735, decided November 17, 1970, objections to the *Allen* charge are weakened when the charge is given as part of the court's original instructions, rather than later after a jury has reported disagreement. (at 736, 445 F. 2d 735). See also Burrup v. United States, 371 F.2d 556, 558 (10th Cir.), cert. denied, 386 U.S. 1034, 87 S.Ct. 1485, 18 L.Ed.2d 596 (1967); United States v. Wynn, 415 F.2d 135, 137 (10th Cir. 1969), cert. denied, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970). That observation is pertinent here where the language of the *Allen* charge appeared in the middle of the court's long general instructions. Furthermore, it was prefaced by the statement that "sometime in reaching a conclusion, this charge is of assistance to a jury"—hardly an intimation of coercion. (Tr. 120) Again, the court concluded its instructions with the statement that "all twelve of you must agree whichever way you find. In short, your verdict must be unanimous." (Tr. 131) I cannot agree that when given in this context, before there was any hint of disagreement or deadlock among the jurors—before there was any minority—the charge could have a coercive impact on any juror. This view seems to have been shared by counsel for the defendant who at the conclusion of the court's long charge announced "Satisfied, Your Honor, nothing further." (Tr. 132)

I turn now to the remarks of the court which are alleged to have exerted a coercive influence after the jury reported inability to agree. In substance the district judge told the jury that he was not going to declare a mistrial and thereby require another day of trial before another jury, a course that in view of the court's substantial backlog of work "just doesn't make sense to me." The judge explained that he was excusing the jurors so that they might "come back tomorrow at 9:30 with a fresh mind and a night's sleep and seek to reach a verdict about the matter one way or the other. * * * See if you can't decide and come to a verdict, think about it overnight individually." (Tr. 135) On the following day, after deliberating for about an hour, the jury asked to have the testimony of the complaining witness read. The foreman explained "it seems as though several of us have gotten different opinions, and we would like to have * * * the testimony." (Tr. 142) The testimony was then read. Before the jury again retired the court

---

1. One of these cases was United States v. Fioravanti, 412 F.2d 407 (3rd Cir.), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), cited by the majority. Although the Circuit Court of Appeals in that case directed that the Bar Association charge be used in the future, it held that the giving of the *Allen* charge, including the statement that "It is your duty * * * to agree, if possible", had not been prejudicial, and the conviction was affirmed. 412 F.2d at 414.

stated: "The court reminds you that your verdict must be the verdict of each individual juror and not a mere acquiescence of the opinions of your fellow jurors. The court also reminds you if you can conscientiously decide this case, the court request[s] that you do so." (Tr. 144)

In my judgment the supplemental remarks of the district court were not coercive but were a legitimate attempt to encourage the jury to agree. Agreement on a verdict ought to be encouraged, for the very purpose and function of a jury is to decide issues of fact, not to engage in inconclusive debate. Certainly the jurors should not be encouraged or invited to disagree. United States v. Bowles, 428 F.2d 592 (2d Cir.), cert. denied, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970). The remark of the court that it made no sense to retry the case on the same evidence before another jury was a statement of a simple truth which must have been as apparent to the jury as it was to the court. The mention of the court's backlog of work was no more coercive than references to the expense or difficulty of a retrial, remarks which in other cases have been held to be proper.

The absence of coercion becomes even plainer when the nature of the disagreement among the jurors is considered. From their request for a reading of the testimony it is apparent that they disagreed not so much in their conclusions from the evidence as in their recollections of what the evidence had been. Once that difference was settled by reference to the transcript the disagreement was resolved. In short, the deadlock was broken by the stenographer, not by the court. I perceive no element of coercion in these proceedings.

Many cases have sustained verdicts returned by a jury after remarks by a trial judge similar to those which the majority here finds coercive. I mention a few illustrative cases.

Kawakita v. United States, 190 F.2d 506 (9th Cir. 1951), aff'd, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952).

After the jury had been out for three days and had reported inability to arrive at a verdict the trial judge gave the *Allen* charge and added:

This is an important case. The trial has been long and expensive. If you should fail to agree on a verdict, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears no reason to believe that another trial would not be equally long and expensive; nor does there appear any reason to believe that the case can be again tried any more exhaustively than it has been on the part of either side. 190 F.2d at 524.

Fulwood v. United States, 125 U.S. App.D.C. 183, 369 F.2d 960 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967). The court in giving the *Allen* charge said:

It is your duty to decide the case, if you can conscientiously do so, and you should listen to each other's arguments with a disposition to be so convinced.

\*    \*    \*    \*    \*    \*

I want you to go back to the jury room and deliberate, and endeavor to arrive at a verdict and consider the case in the light of these particular instructions.

Bear in mind, ladies and gentlemen of the jury, that some jury some time will have the duty to decide this case, and I hope that you, as the jury in this case, will be able to decide the matter. (Tr. 322–323)

Affirming the judgment this court, in an opinion by Circuit Judge Burger, observed:

The statement that some other jury would have to decide the case if this one could not was accurate as a generality and, in any event, could have had no coercive impact on the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing

the pressure on them to reach a verdict. 125 U.S.App.D.C. at 186, 369 F.2d at 963.

Hodges v. United States, 408 F.2d 543 (8th Cir. 1969). The court in its supplemental charge said:

> Gentlemen, I want to talk to you about it a little. You should consider that the case must sometime be decided, and that you are selected in the same manner as other juries. Failure to agree upon a verdict will necessitate another trial equally as long and as expensive.
>
> The Court is of the opinion that the case cannot again be tried in a better or more exhaustive manner. It is therefore very desirable that you should return a verdict. The only manner provided by our Constitution and laws for deciding questions of fact is by a verdict of a jury. 408 F.2d at 553 n. 4.

United States v. Wynn, 415 F.2d 135 (10th Cir. 1969), cert. denied, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970). The court's supplemental charge included these remarks:

> The court would like to advise you that if the jury is unable to reach a verdict in the case it is necessary then for the judge to declare what is known as a mistrial. This means that the case will have to be tried all over again before another jury. As you can easily see, this involves considerable expense and considerable effort. And it is something that we try to avoid, hope that we can avoid in all cases for the purposes of economy. I don't think we will get any better jury if we tried the case again than we have in the box now, nor do I feel that the case will be any better presented to you than it is now.
>
> So, it is—it is necessary that we do our utmost to avoid the declaration of a mistrial in the case.
>
> \* \* \* \* \* \*
>
> As you know, it has taken us considerable time to try this case. There has been a great many witnesses come from long distances to be here. We hope we won't have to do this again. So, the court will ask you gentlemen if you will please, retire again in the custody of the bailiffs and resume the deliberations again and it is hoped that you can reach a verdict in the case. 415 F.2d at 136.

See also United States v. Rao, 394 F.2d 354, 355 (2d Cir.), cert. denied, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968).[2]

In summary, I cannot agree that the jury was coerced by the *Allen* charge, or by the court's other remarks, or by the combination of the two. I would affirm the conviction.

In my judgment also, the *Allen* charge should not be outlawed in favor of the instruction recommended by the American Bar Association. I must decline to exalt the recommendation of the Bar Association over the decisions of the Su-

---

2. Similar remarks to deadlocked juries in civil cases have been sustained. Wilson v. Southern Farm Bureau Cas. Co., 275 F.2d 819 (5th Cir.), cert. denied, 364 U.S. 817, 81 S.Ct. 49, 5 L.Ed.2d 48 (1960); Silverman v. Travelers Ins. Co., 277 F.2d 257 (5th Cir. 1960). In both cases the court (Wright, District Judge) told the jury:

> You must realize that you have heard all of the facts in this particular case. It is a case that must be decided. There is no reason to believe that twelve other jurors will be more successful in reaching a verdict in this matter than you will have been. You must give intelligent and cooperative attention to this consideration in order that there may be a resolution of this conflict which exists between the plaintiff and the defendant in this case. 275 F.2d at 822; 277 F.2d at 264.

preme Court of the United States. I suggest in this connection that we may be confronted with a problem in the future if some district judge, following the Supreme Court instead of the Bar Association, gives the *Allen* charge. Will we then overrule the Supreme Court by holding the charge is erroneous?

We are told that one reason for adopting the Bar Association instruction is that district judges frequently deviate from the approved language of the *Allen* charge. Yet if in spite of our pleas for conformity district judges have strayed from the litany approved by the Supreme Court I think it reasonable to assume that they may also deviate from the formula prescribed by the Bar Association. If they hear not the Supreme Court and this court neither will they be persuaded by the Bar Association; and, contrary to the hopes of the majority, the "aberrations of the charge" which disturb the majority will still occur.

An assumption by critics of the *Allen* charge seems to be that it produces only verdicts of guilty. I am not aware of any statistics that support this theory. *See* United States v. Sawyers, 423 F.2d 1335 (4th Cir. 1970). Certainly scholars can find no support for it in the reported cases, for judgments of acquittal are not appealed and therefore do not appear in the books. We do not know how many defendants have been spared the ordeal and expense of a retrial because a jury was reminded of its duties by the sound counsel of the *Allen* charge.

On its merits I prefer the *Allen* charge to the Bar Association language. I adhere to the views expressed in my dissent in United States v. Johnson, 139 U.S.App.D.C. 193, 203–204, 432 F.2d

626, 636–637, cert. denied, 400 U.S. 949, 91 S.Ct. 257, 27 L.Ed.2d 255 (1970) that the *Allen* charge is sensible advice for any group of men and women sitting around a table to decide a question of fact; and that the diluted version proposed by the Bar Association is an invitation to a stubborn or recalcitrant juror to persist in a blind adherence to his position, thereby producing a hung jury. As Judge Burger put it in Fulwood v. United States, 125 U.S.App.D.C. 183, 185, 369 F.2d 960, 962 (1966), cert. denied, 387 U.S. 934, 87 S.Ct. 2058, 18 L. Ed.2d 996 (1967):

> [T]he *Allen* charge is a carefully balanced method of reminding jurors of their elementary obligations, which they can lose sight of during protracted deliberations. It is perfectly valid to remind them that they should give some thought to the views of others and should reconsider their position in light of those views. The charge as given here did not *require* the jury to reach a verdict but only reminded them of their duty to attempt an accommodation. While it suggests to the minority that they reconsider their position in light of a majority having a different view, it reminds them that they should not acquiesce in a verdict which does not represent their own convictions. (Emphasis in original.)

I see no reason to abandon or substantially revise the *Allen* charge. Accordingly, I dissent from the majority's direction that it not be used in the future.

Circuit Judges TAMM, MacKINNON and WILKEY concur in this dissent.