**David L. STROUD**

v.

**Frank A. HALL et al.**

**Civ. A. No. 74-790-C.**

United States District Court,
D. Massachusetts.

Dec. 20, 1974.

William A. Nelson, Malvine Nathanson, Mass. Defenders Committee, Boston, Mass., for petitioner.

Robert Quinn, Atty. Gen., Dennis J. LaCroix, Deputy Asst. Atty. Gen., for defendant.

## MEMORANDUM AND ORDER

CAFFREY, Chief Judge.

This is a petition for a writ of habeas corpus. Jurisdiction of this court in invoked under 28 U.S.C.A. § 2241 et seq. Petitioner is presently an inmate at the Massachusetts Correctional Institution at Norfolk. Respondent Frank A. Hall is Commissioner of Correction, Commonwealth of Massachusetts, and respondent Larry Meachum is Superintendent of the MCI at Norfolk.

After a jury trial petitioner was convicted on May 20, 1971, of assault with intent to commit rape and was sentenced to a term of not less than 10 nor more than 25 years imprisonment. Prior to trial he moved to suppress certain physical evidence and identification testimony. The motion to suppress evidence was allowed in part and denied in part. The motion to suppress the identification was denied *in toto*. Petitioner saved his rights on these rulings and duly presented them to the Supreme Judicial Court which affirmed his conviction in an opinion reported as Commonwealth v. Stroud, 1972 Mass.Adv.Sh.

775, 281 N.E.2d 599. The record before this court includes a certified copy of the transcript of the trial, which took place in Franklin Superior Court before the Honorable Levin H. Campbell and a jury. It also includes a 14-page Findings of Fact and Rulings on Defendant's Motion to Suppress, filed by Judge Campbell on June 16, 1971, after a hearing on defendant's motion to suppress. The parties, who orally argued the matter briefly, have filed substantial memoranda of law on which they place their principal reliance. Neither party has sought an additional evidentiary hearing and they have indicated to the court that they are agreeable to the matter's being resolved on the basis of the state court record in the light of their memoranda of law.

A review of petitioner's memorandum suggests that he substantially adopts the facts of the case as found by the Superior and the Supreme Judicial Courts, although he alleges that he was not advised of his right to court-appointed counsel at a show-up. This contention has been resolved adversely to petitioner by a specific finding that State Police Officer Bruce E. Smith advised him that he had "a right to have an attorney present at the infirmary if he wished." This finding is supported by the testimony of Trooper Smith (Tr. 94–95). For that reason, this court will not conduct an evidentiary hearing on this allegation of petitioner. Cf. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

No evidence has been tendered herein suggesting that the findings of the state court are erroneous and, absent such evidence, those findings are accepted by this court. Cf. Leavitt v. Howard, 462 F.2d 992 (1 Cir. 1972), cert. den. 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). See also, La Vallee v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L. Ed.2d 637 (1973). Accordingly, there remains for decision herein two separate legal issues raised by petitioner, (1) whether petitioner's sweatshirt and a pretrial confrontation between pe-

titioner and the victim of the crime were the fruits of an illegal police intrusion into petitioner's room, and (2) whether the show-up or confrontation was conducive to mistaken identification. Both of these issues arise from the facts found by Judge Campbell, copy of which is attached hereto as Appendix A.

Judge Campbell ruled that the police entry into Stroud's room was justified by the exigent circumstances then existing, noting that while the police may have, prior to the entry, lacked probable cause to arrest petitioner, they did know that a serious felony had occurred on the relatively isolated school grounds and that they had good grounds to suspect the occupant of the room, having in mind that there was no other suspect. Alternatively, Judge Campbell ruled that the headmaster of the school had implied permission under the then prevailing circumstances to enter an employee's room. However, despite this alternative ruling, Judge Campbell, "for reasons of caution," treated the entry into the room as unjustified, and suppressed evidence as to what the police saw or found in petitioner's room in the period immediately after entry. Judge Campbell, however, denied petitioner's motion to suppress the admissibility of the orange and green sweatshirt, on the grounds that that was taken from Stroud's person, a considerable period of time after his arrest, as clothing worn by him at the time of the arrest. In so ruling, Judge Campbell noted that the sweatshirt was something freely and voluntarily put on by Stroud prior to his arrest, that it was not a product of the early entry into his room, and that its identification rested on facts and circumstances wholly apart from the fact that it was at one point observed by the police on a chair in Stroud's room. This court notes that the police did not arrest petitioner in his room, nor did they seize the orange and green sweatshirt at that time. In fact, the police specifically advised petitioner in his room that he was not under arrest and that he need not

accompany them to the school infirmary if he elected not to do so. It should be noted that the state court record establishes that the petitioner made his own decision to accompany the officers to the infirmary after being advised that he had no legal obligation to go there, and the state court record also establishes that he selected the orange and green sweatshirt as part of the clothing he wore to the infirmary. No suggestion of a request that he wear the sweatshirt to the infirmary is contained in the state court record.

█ I rule that petitioner's voluntarily making a decision to accompany the officers, and voluntarily deciding to wear the sweatshirt while so doing, are two independent acts "sufficient to break the causal connection between the alleged primary illegality and the evidence found." United States v. Fike, 449 F.2d 191, 193 (5 Cir. 1971).

The facts of the instant case, assuming the original entry into petitioner's room to have been illegal, would nevertheless seem to fall within the observation of Judge Coffin, concurring, in Commonwealth of Massachusetts v. Painten, 368 F.2d 142, 144 (1 Cir. 1966):

"Even if the request to enter in this case was improper, it by no means follows that that conduct alone was so shocking as to taint evidence virtually handed to the officers on a silver platter."

Accordingly, I rule that no error of federal law has been shown in the admission into evidence of petitioner's sweatshirt, nor has it been shown that the pretrial confrontation between petitioner and the victim were fruits of any illegal police intrusion into petitioner's room.

█ With regard to petitioner's second contention, that the show-up confrontation between petitioner and the victim was conducive to mistaken identification, it should be noted that an on-the-scene confrontation is not *per se* unlawful. The Court of Appeals for the

District of Columbia, in United States v. Wilson, 140 U.S.App.D.C. 331, 435 F.2d 403, at 405 (1970), ruled:

"[T]he benefit of a prompt on-the-scene confrontation makes acceptable the necessary suggestiveness of presentation of a single subject."

The same court observed in an earlier decision, in Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, at 1106 (1968):

" . . . Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to identification needed to be resolved promptly; absent such need the conventional line-up viewing is the appropriate procedure."

■ I rule that the facts of the instant case, involving a crime of violence at an isolated boarding school, presented a situation with a need for prompt resolution of doubts as to the identification of the assailant.

The Supreme Court has indicated the factors to be considered in deciding whether a show-up is so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification. In Neil v. Biggers, 409 U.S. 188, at 199–200, 93 S.Ct. 375, at 382, 34 L.Ed.2d 401 (1972), Justice Powell observed:

"[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

1. With regard to the "opportunity of the witness to view the criminal at the time of the crime," the record shows that the victim talked to her assailant for roughly one to two minutes, he was in her room for approximately five minutes, she got a good look at the man, the room was illuminated by both a hallway light outside the apartment door and a light in an adjacent hall of her residence.

2. With regard to the witness' "degree of attention," the nature of the offense involved herein obviously caused the victim to pay substantial attention to her assailant. The language of the Supreme Court in Neil v. Biggers, *supra*, is applicable to the victim in the instant case:

"She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes . . . [a] nurse by profession [she] had an unusual opportunity to observe and identify her assailant . . . ." (pp. 200–201, 93 S.Ct. at pp. 382–383.

3. With regard to the "accuracy of the witness' prior description of the criminal," the record shows that she described her assailant as a black male, medium build, 5′6″ or 5′7″ in height, with short hair, wearing an orange sweatshirt with a green V, and dark trousers. She also described his age as not young, middle aged, and in his late twenties. The record establishes that petitioner is black, 5′8″ tall, of medium build, with short hair. The trial court found that he looks older than his 29 years. This description of the assailant by the victim, given at a time when the record indicates she was distraught and in need of a sedative, was detailed, thorough, and similar to that found by the court to be "complete and accurate" in United States v. Washington, 144 U.S. App.D.C. 338, 447 F.2d 308, 312 (1970).

4. With regard to the "level of certainty demonstrated by the witness at the confrontation," the victim stated without hesitation that the defendant was positively her assailant.

5. With regard to the "length of time between the crime and the confrontation," the record establishes that between one and one-half and two hours elapsed between the attack and the show-up.

On the basis of the application of the five factors outlined by the Supreme Court in Neil v. Biggers, I rule that there has been no showing herein of an illegal suggestive confrontation, nor of a confrontation tending to produce an irreparable misidentification. Accordingly, I rule that there has been no showing herein of the deprivation to petitioner of any federal right in the course of his arrest or in the course of the litigation in the courts of the Commonwealth, and it is

Ordered: The petition for a writ of habeas corpus is denied.

## APPENDIX A

Commonwealth of Massachusetts
Franklin, SS.

Superior Court
No. 3959

Commonwealth

v.

David L. Stroud

## FINDINGS OF FACT AND RULINGS ON DEFENDANT'S MOTIONS TO SUPPRESS

Between the hours of 11:30 and 12:00 p. m. on October 25, 1970, Mrs. Elizabeth Niehaus, a registered nurse, employed at the school, was assaulted in her apartment in the infirmary building of the Eaglebrook School, Deerfield. Eaglebrook is a private boarding school. Her apartment is on the south side and the top floor of the building. (From the front, it is on the second floor; from the back, it is on the third floor).

Just before the assault, Mrs. Niehaus was in bed, reading. She heard footsteps downstairs; heard the front door close at the foot of the stairs leading up to her apartment; and then heard her doorknob rattle and the door leading into the front hall of her apartment open. She got out of bed, put on her robe, and went into the hall of her apartment. A black man, whom she says she did not recognize, was standing there by the door.

She told him to leave immediately. He just stood there and looked at her. She continued to tell him to leave, and he continued to stand there. She walked toward the door, which was partially open, to try to get it closed. However, he was in too far, and she couldn't. As she got over to the door, the man told her to be quiet. The more he told her to be quiet, the more noise she tried to make, hoping to arouse her young son who was sleeping in another room nearby.

The man asked if her husband was home. Mrs. Niehaus replied that it was none of his business. She talked to the man for a minute or two. She got a good look at the man. She could see him, as there was illumination from the hallway light outside the partly opened door and also from a light in an adjacent hallway in the apartment.

The man then grabbed her by her shoulders and arms. They struggled, and the next thing she remembered was hitting the floor of the bathroom of her apartment, which was located just off the front hall. The man lay on top of her and put his face in hers. He put his right hand against her nose and his left hand into her pubic area with his fingers into the vaginal area. She struggled more, and he removed his hand and put it around her neck. At about this time her son, accompanied by her dog, appeared on the scene. She told her son to go for help. Her assailant completely cut off the air, so that she couldn't breathe any more. He then left.

Mrs. Niehaus estimates that the man was in the apartment for from five to ten minutes. She testified that the most predominant thing she remembered about the man was his shirt, which was an orange sweatshirt with a green "V" in it, and his eyes. She did not "visualize" a mustache.

When the man had left, Mrs. Niehaus telephoned Mr. Robert M. Easton, a master at the school. The call was placed at about quarter or ten of midnight. Mr. Easton immediately went over to her apartment, and he then

called the Deerfield police from there. The Deerfield police received the call shortly after midnight.

In response to that call, two Deerfield police officers, John Skroski and an Officer Skinner, came to the infirmary building. Mr. Easton met them outside the building, and brought them upstairs to Mrs. Niehaus' apartment. About a half hour later, Chief Rosenthal of the Deerfield police arrived, and at about this same time two State Troopers also arrived, Troopers Bernard Lajoie and Bruce E. Smith.

I find that at this time Mrs. Niehaus described her assailant to the police and to Mr. Easton as having been a black male. medium build, five foot six or seven inches tall. She said that he had been wearing an orange sweatshirt with a green "V" and dark pants. She said that he had short hair. It is testified that she described his age to them variously, as not young, but middle-aged looking and also, as in his late twenties. The defendant Stroud is black, is five feet, eight inches tall, is 29 years of age, and of medium build. From his appearance in the courtroom, I find that he appears to be older than 29. At the trial he had a small mustache. His hair was short.

I find that Mr. Easton and several of the officers then split up and conducted an immediate search of the school grounds and the area near the infirmary. Eaglebrook School to the northwest and northeast sides has many small dirt roads going off to Greenfield and Turners Falls. The search was directed towards looking for people and vehicles on the roads. Darkened areas, and parking areas, were checked. Nothing helpful was found. The searchers found no evidence that the assailant had arrived or left by automobile. For this reason, they formed the belief that the assailant might still be in the immediate vicinity of the school.

While the search was proceeding, the headmaster of the school, Mr. Oliver S. Chase, arrived on the scene in response to a telephone call from Mr. Easton.

The two State Troopers asked Mr. Chase whether there were any black school employees, and he informed them that there was one, a kitchen worker, who had been in the employ of the school for several weeks. The one black employee was the defendant, David Stroud.

It is not clear who first mentioned the existence of a black employee to the police. Mr. Chase believed that Mr. Easton first mentioned it; Chief Rosenthal testified that Mrs. Niehaus told him of the employee.

Mr. Chase had seen the employee daily since he had commenced work, but did not then know his last name. The employee had been hired by the school chef. Mr. Chase described the employee to the police as "good-looking, short-haired, medium build, well-knit, something to that effect," (Tr. 47). He said that, to his knowledge, he was a good employee.

I find that Mrs. Niehaus had seen the employee only once before the attack. He was then in the kitchen, stooping down with his back toward her; as she came in, he turned his head. At the time of the attack, she did not recognize her assailant as being the employee whom she had seen on that one previous occasion.

After the police and school officials had discussed the existence of the black employee, they proceeded directly to the building where he was understood to be living, after making one last (and futile) "close search" of the infirmary area. The employee lived in a room on the ground floor of the building containing the kitchen. His room was one of three kitchen helpers' rooms adjacent to each other. These rooms look to the infirmary building, which is about 75 feet away. The defendant Stroud was furnished his room by the school, as it was convenient for him because he did not have transportation of his own. Not all kitchen help are furnished a room; it does not affect their compensation. Stroud's room has a single bed and is about 11½ by 8 feet in size. At the time, Stroud had a key to the door of his room. Mr. Chase had a master key fit-

ting all locks in the school, including Stroud's. The headmaster had such a key, as he testified, "for just such a reason, protection of the boys under my charge." (Tr. 48)

The police who went to the building where the defendant lived were Troopers Lajoie and Smith and Officer Skroski. They were accompanied by Mr. Easton and Mr. Chase. At this time, Trooper Lajoie had learned that the black employee's first name was David; he did not then know his last name, nor did he nor the others know in which of the three kitchen helpers' rooms he lived. They arrived at the kitchen building at approximately 1:20 or 1:30 a.m.

The party first checked one of the three rooms which had a light on within. They knocked and called to be let in. Mr. Chase then used his master key and entered. The occupant, named Lee, who was asleep, awoke. Mr. Chase apologized for the intrusion and withdrew. The next kitchen helper's room was found to be empty.

Mr. Chase then returned to Lee's room and asked if there was anyone in the third room. Lee said there was. The group then went to the third room. I find that by this time about an hour had elapsed since the alleged attack, and about 25 minutes had elapsed since the police had learned that a black school employee, generally conforming to Mrs. Niehaus' description of her assailant, was living in that building. I find that at this time the police had probable cause to believe that a vicious felony had occurred. They also had reasonable grounds to suspect that the assailant was still nearby, and that his presence would constitute a continuing danger both to them and to the boys and staff sleeping at the school. I further find that at this time no other suspect conforming to Mrs. Niehaus' description had been brought to the attention of those investigating the crime.

The door was found to be locked. Mr. Chase and the Troopers knocked repeatedly, and Mr. Chase called, "David." Mr. Chase said, "We would like to talk to you, may I come in, that sort of thing."

There was a rustling and "sound of life" (Tr. 49) inside the room. Neither Mr. Chase, Trooper Smith, nor Officer Skroski heard any response, although Officer Skroski heard "a mumbling noise." (Mr. Easton was standing in the hall, "a considerable distance from the door"). (Tr. 84) Trooper Lajoie heard rummaging in the room and the sound of bed springs. He also heard the one word, "Yuh," in response to Mr. Chase's request for permission to come in. Mr. Chase then unlocked the door, using his master key, and admitted the two State Troopers, who went into the room.

Mr. Chase also went partly in, but then withdrew at the request of the Troopers. Officer Skorski did not go in. Mr. Chase did not overhear what the Troopers thereafter said to Stroud, but testified that, "It was a very peaceful confrontation. There was no violence or loud talk." (Tr. 51) "My general impression was that Mr. Stroud was being treated very gently, deferentially, by the Troopers." (Tr. 52).

No light was on in the room; however, there was sufficient light from the hall and the window which faced the infirmary to see. The defendant Stroud was on the bed, in his underwear, with coverings thrown carelessly over him. To Mr. Chase and Trooper Lajoie, he gave the impression of not having been sound asleep. On a chair by the bed was an orange sweater or sweatshirt with a green "V" on it. There were also pants and other articles of clothing on the chair. The Troopers identified themselves. They said that they were investigating an assault and that he could be a possible suspect. The defendant denied any responsibility and stated he had nothing to hide. Trooper Smith advised him of his rights "to a degree." Trooper Smith told Stroud that he didn't have to say anything; anything he did say could and would be used against him. Stroud replied that he understood what was going on. The Troopers asked

the defendant if he would cooperate. They said they needed to clear this up soon.

Trooper Lajoie had made a quick search of Stroud's bunk when he first walked in, looking for weapons. I find that this search was made for the Troopers' self protection and was reasonable under the circumstances. It was done without asking the defendant's permission. Thereafter, Lajoie or Trooper Smith asked Stroud for permission to make a search of the room. I find that Stroud gave them permission to do so, and that a more thorough search was then made pursuant to the defendant's express permission. Nothing material (besides the clothing already noted as being in plain view on the chair) was found in the course of either search.

The Troopers then asked the defendant if he would mind going with them to the infirmary. I find that they told Stroud that he did not have to go along with them and that he was not under arrest. I find that the defendant said that he was perfectly willing to go along. Trooper Smith advised him that at the infirmary a woman who had been attacked could identify him. Trooper Smith also stated to Stroud that he had a right to have an attorney present at the infirmary if he wished. The defendant did not request an attorney.

At the Troopers' request, the defendant then dressed. Without prompting from either Trooper as to what articles of clothing to put on, he dressed himself in the clothing on the chair, including the orange and green sweatshirt. He then walked with the Troopers to the infirmary.

I find that the defendant at no time asked the Troopers to leave his room. I find that when asked, he gave them permission to search the room and that he cooperated with them and voluntarily accompanied them to the infirmary. I find that neither the sweatshirt nor any other article of clothing nor any other objects were then or thereafter taken by the Troopers from the room.

The Troopers then walked with the defendant to the infirmary building. They led the defendant to a corridor adjacent to Mrs. Niehaus' top-floor apartment. The time was then about 1:35 or 1:45. They asked him to remain there, and Mrs. Niehaus was requested to come out and view him. She did so, and stated without hesitation that the defendant was positively her assailant. The defendant was standing under a light at the time. Trooper Lajoie warned Mrs. Niehaus that she should be absolutely positive of her identification, and that if she wasn't positive, she had nothing to be ashamed of. After her first identification, he had her return on one or two occasions to the corridor to take a further and closer look at the defendant. She repeated on these occasions that he was the man who had assaulted her. I find that no effort was made by the Troopers or Deerfield officers to suggest to Mrs. Niehaus that she should identify Stroud as her assailant.

After Mrs. Niehaus had identified the defendant, the Troopers then placed the defendant under arrest, handcuffed him, took him to their cruiser, and drove with him to the Northampton barracks. He has since remained in custody. When placed in the cruiser, he was read the full Miranda warning.

The defendant continued to wear the orange sweatshirt with the green "V" from the time that he had put it on in his room until he was arrested and driven to the barracks in the cruiser and for some time thereafter. The sweatshirt was later taken from him while he was in custody, by Chief Rosenthal.